IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No.__:_______-CV-____ - ____

| | | |
|---|---|---|
| ZHONGXIAO MICHAEL CHEN, PH.D.<br><br>Plaintiff,<br><br>*v.* -<br><br>JERRY BARON, PH.D, individually and in his official capacities as IR-4 Executive Director and as a NCSU employee; DEBORAH CARPENTER, PH.D., individually and in her official capacities as IR-4 Associate Director and a NCSU employee; JOHN WISE, PH.D., individually and in his official capacities as IR-4 Board Chair, IR-4 North Central Region Director, a MSU employee, and an agent of NCSU; STEVEN LOMMEL, PH.D., individually and in his official capacities as the IR-4 Headquarters Administrative Advisor and a NCSU employee; DOUGLAS BUHLER, PH.D., individually and in his official capacities as the IR-4 North Central Regional Administrative Advisor, a MSU employee, and an agent of NCSU; and DEFENDANT DOES 6 THROUGH 100<br><br>Defendants. | ) | CIVIL ACTION COMPLAINT<br><br>Jury Trial Demanded |

Plaintiff Zhongxiao Michael Chen, Ph.D. ("Dr. Chen"), by and through his attorneys, AVA Law Group, hereby submits this Complaint against **Jerry Baron, Ph.D.,** individually and in his official capacities as IR-4 Executive Director and as a NCSU employee; **Deborah Carpenter, Ph.D.**, individually and in her official capacities as IR-4 Associate Director and as a NCSU employee; **John Wise, Ph.D.**, individually and in his official capacities as IR-4 Board Chair, IR-4 North Central Regional ("NCR") Director, a MSU employee, and an agent of NCSU;

**Steven Lommel, Ph.D.**, individually and in his official capacities as IR-4 Headquarters ("HQ") Administrative Advisor and a NCSU employee; and **Douglas Buhler, Ph.D.**, individually and in his official capacities as IR-4 NCR Administrative Advisor, a MSU employee, and an agent of NCSU; and Defendant Does 6 through 100 for claims arising under the United States Constitution, Amendments I and XIV, 42 U.S.C.§1983, and 42 U.S.C.§1985.

Plaintiff states and alleges the following:[1]

**TABLE OF CONTENTS** **Page No.**


I. NATURE OF THE ACTION ....3

II. APPLICABLE LAW ....4

A. U.S. Const. amend. I and XIV; 42 U.S.C. §1983 and 42 U.S.C. §1985 ....4

III. PARTIES ....5

IV. JURISDICTION AND VENUE ....9

V. STATEMENT OF FACTS ....10

A. Relationship of NCSU and MSU Vis-à-Vis IR-4 and Defendants' Employment 10
B. IR-4's Regulatory Framework ....12
C. Dr. Chen's Work History from 2000 to 2015 ....14
D. Dr. Chen Finds Frequent Improper Manual Integrations in 2014 and 2015 ....16
E. The New Lab QA Auditor Also Finds GLP Issues Starting in 2015, Establishing that Defendants Baron, Carpenter, Wise, and Buhler Were Incompetent to Conduct the Regulated Pesticide Safety Studies. ....17
F. Defendants Baron, Carpenter, and Wise Give Lip Service to GLPs in 2020....20
G. The Events Which Led to Dr. Chen's Firing in November 2022....21
H. Defendants' Wrongful Conduct Caused Dr. Chen's Damages....31


---

[1] The majority of the allegations in this complaint are substantiated by documented evidence found from public sources, the remainder have been made upon information or belief. **<u>All documents cited in this Complaint are incorporated herein by reference</u>**.
Affidavits of Dr. Chen and Attorney Sandra Daussin, counsel for Dr. Chen, are included with this Complaint.

VI. CAUSES OF ACTION ....................................................................................35

Count 1 – Free Speech: ....................................................................................35
Count 2 – Due Process: ....................................................................................37
Count 3 – Civil Conspiracy: ..............................................................................38

## I. NATURE OF THE ACTION

1. This matter arose when Defendants Jerry Baron, Ph.D., Deborah Carpenter, Ph.D., John Wise, Ph.D., Steven Lommel, Ph.D., and Douglas Buhler, Ph.D. (collectively "Defendants") violated Dr. Chen's constitutional rights to freedom of speech and due process under U.S. Const. amend. I and XIV when they wrongfully interfered with Dr. Chen's employment for the unlawful purpose of covering up what he found in his normal job duties.

2. Dr. Chen was employed from May 2000 until November 18, 2022 by Michigan State University ("MSU") to serve as the Quality Assurance ("QA") Director for the Interregional Project No. 4 ("IR-4") North Central Region ("NCR"). Dr. Chen, like other IR-4 staff members, was an employee of his host institution, and his salary was paid with IR-4 funds. IR-4 obtains its funding from public and private sources. IR-4 NCR is hosted by MSU. IR-4 headquarters ("HQ") is currently hosted by North Carolina State University ("NCSU"), having moved there in 2019. Prior to this, IR-4 HQ was at Rutgers University ("Rutgers").

3. Defendants were employees of either MSU or NCSU at the relevant times. Defendants were acting under color of law at the relevant times.

4. IR-4 is an organization that conducts pesticide safety studies. These safety studies must be conducted in accordance with a regulation called the Good Laboratory Practice standards ("GLP" or "GLPs"). 40 CFR §160. Dr. Chen's role as QA Director is defined in the GLP regulations, and his duties were mandated by federal law.

5. Dr. Chen repeatedly reported serious GLP compliance issues at the IR-4 NCR lab to Defendants Baron, Carpenter, Wise, and Buhler over the years, but they failed to remedy the problems. In 2021, this came to a head when Dr. Chen identified significant issues in a safety study for a pesticide owned by ISK Biosciences Corporation. Instead of remedying the issues that Dr. Chen was *legally obligated* to report under 40 CFR §160, Defendants sought to permanently silence him.

6. Their first effort was to seek Dr. Chen's termination for cause by MSU Human Resources ("HR"). When MSU HR found no grounds to fire Dr. Chen, Defendants took further action. In 2022, Defendants ceased funding for Dr. Chen's position at MSU, damaged his reputation to prevent future employment with IR-4 or MSU, closed the lab, and destroyed the incriminating evidence by discarding the raw data from the lab instruments. When the funding for Dr. Chen's position was cut off, he was given no opportunity to be heard. During this same timeframe, IR-4 hired two new QA auditors at IR-4 HQ and a new Field Director at IR-4 NCR. Dr. Chen was more than qualified to fill any of these positions.

7. Dr. Chen has suffered severe emotional distress, lost wages, and lost retirement benefits caused by Defendants' violations of Dr. Chen's constitutional rights to free speech and due process, and by Defendants' civil conspiracy to violate Dr. Chen's constitutional rights. U.S. Const. amend. I, XIV; 42 U.S.C. §§1983, 1985.

## II. APPLICABLE LAW

### A. U.S. CONST. AMEND. I AND XIV; 42 U.S.C. §1983 AND 42 U.S.C. §1985

8. A violation of constitutional rights under color of state law gives rise to an action under 42 U.S.C.§1983. Conspiracy to violate civil rights gives rise to an action under 42 U.S.C. §1985.

9. The right to free speech is protected under the U.S. Const. amend. I. It is well-settled that this right is highly protected when the speech is on matters of public importance. *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 573, 20 L. Ed. 2d 811 (1968). Also, that sovereign immunity is not a defense against §1983 actions. *Corum v. Univ. of N. Carolina Through Bd. of Governors*, 413 S.E.2d 276, 283-84 (1992).

10. The U.S. Const. amend. XIV prohibits State governments and their officials operating under state authority from depriving any person of their property without due process of law. *Dusenbery v. United States*, 534 U.S. 161, 167, 151 L. Ed. 2d 597 (2002). The Fourth Circuit has held that North Carolina public universities are arms and alter egos of the State. *McAdoo v. Univ. of N. Carolina at Chapel Hill*, 248 F. Supp. 3d 705 (M.D.N.C. 2017).

11. Public employees have a constitutionally protected property interest in their employment. U.S. Const. amend. XIV; *Hatley v. City of Charlotte*, 826 F.Supp.2d 890, 898 (2011). The essential elements for a U.S. Const. amend. XIV procedural due process claim for property deprivation are: (1) a property interest, (2) of which plaintiff was deprived by the defendant, and (3) without due process of law, meaning a reasonable notice and the right to be heard. *Id.*

## III. PARTIES

12. **Plaintiff Zhongxiao Michael Chen, Ph.D., ("Dr. Chen")**, is domiciled in the State of Michigan and owns a home at 3812 Viceroy Dr, Okemos, Michigan 48864. Dr. Chen has recently moved to Maryland and resides at 384 N Summit Ave, Apartment #203, Gaithersburg, Maryland 20877. This move is not permanent, and he intends to return to his home in Michigan. Dr. Chen was an MSU employee from May 2000 until November 18, 2022. Dr. Chen's position at MSU was fully funded by IR-4, and he served as the IR-4 NCR QA Director. Dr. Chen holds a Ph.D. in entomology

and nematology. Dr. Chen has authored thousands of QA reports and has achieved dozens of successful QA audits by federal authorities. Dr. Chen has also authored in numerous peer-reviewed scientific publications, book chapters, and books, and has been invited to speak at more than thirty professional conferences including international workshops.

13. **Defendant Jerry Baron, Ph.D. ("Defendant Baron")** is a resident of North Carolina. Defendant Baron was acting under color of law and within the scope of his NCSU employment at the relevant times.[2] At all times relevant, Defendant Baron was working from IR-4 HQ at NCSU. Upon information and belief, IR-4 funded most, if not all, of Defendant Baron's annual NCSU salary at all relevant times. The allegations herein relate to Defendant Baron's conduct as an individual and in his official capacities as IR-4 Executive Director and an NCSU employee.

14. Defendant Baron earned his Ph.D. from NCSU in 1985 and joined IR-4 in 1986. Defendant Baron has been the IR-4 Executive Director since 2006, and began this role when the IR-4 HQ was stationed at Rutgers. When IR-4's HQ moved to NCSU, Defendant Baron continued to serve as IR-4 Executive Director. He was hired by NCSU on January 1, 2020. Defendant Baron has announced he will retire from IR-4 in October 2025.

15. **Defendant Deborah Carpenter, Ph.D. ("Defendant Carpenter")** is a resident of Pennsylvania. Defendant Carpenter was acting under color of law and within the scope of her NCSU employment at all times relevant. [3] At all times relevant, Defendant Carpenter was working from IR-4 HQ at NCSU. She works at times remotely from her home in Pennsylvania. Upon information and

---

[2] See *infra* n. 4.

[3] See *infra* n. 4.

belief, IR-4 funded most, if not all, of Defendant Carpenter's NCSU salary at all relevant times. The allegations herein relate to Defendant Carpenter's conduct as an individual and in her official capacities as IR-4 Associate Director and an NCSU employee.

16. Defendant Carpenter holds a doctorate in chemistry from the University of Rochester. She began working for IR-4 in 2005, as a Rutgers employee when the IR-4 HQ was stationed there. On or around July 2021, Defendant Carpenter was hired by NCSU. On October 4, 2021, Defendant Carpenter assumed the role of Associate Director at the IR-4 HQ at NCSU.

17. **Defendant John Wise, Ph.D. ("Defendant Wise")** is a resident of Michigan. Defendant Wise was acting under color of law at all times relevant and within the scope of his employment at MSU and agency at NCSU.[4] At all relevant times, Defendant Wise was employed by MSU and served as the IR-4 NCR Director and IR-4 Board Chair. Upon information and belief, at all times relevant, NCSU provided IR-4 grant money to MSU to cover the part of Defendant Wise's

---

[4] Defendant Wise is represented by the North Carolina Attorney General's Office in a related lawsuit that was filed in the North Carolina Superior Court for state law violations, even though Defendant Wise has never lived or worked in North Carolina. *See* Case No. 25CV004014-910. The issue of the public/private status of Defendants is in dispute in this Superior Court matter. It is well-settled that for an entity to be considered public, it must be under the *sole and exclusive* control of the government. *Piedmont Mem'l Hosp. v. Guilford Cnty.*, 12 S.E.2d 265, 268 (1940). IR-4 has a board of directors ("IR-4 Board") which controls the activities of IR-4. The IR-4 Board is comprised of employees of public institutions and a member of the private sector. Thus, IR-4's interests *are not* under the exclusive control of the government. This fact alone is dispositive. Nevertheless, Assistant AG Martin of the North Carolina Attorney General's Office, who represents IR-4, IR-4 Board and Defendants Baron, Carpenter, and Wise in the Superior Court matter, has repeatedly alleged without providing any evidence that IR-4 *in toto* is a subunit of NCSU and that all of its actors enjoy the immunity. The Superior Court matter was filed on January 31, 2025. To date, there has been no discovery in that matter. There are pending motions to dismiss and motions for a protective order by all defendants. Nothing in this Complaint negates any of Plaintiff's pleadings in the Superior Court matter.

salary for the work he performed as the IR-4 NCR Administrative Advisor. The allegations in this Complaint relate to Defendant Wise's conduct as an individual and in his official capacities as IR-4 NCR Director, IR-4 Board Chair, an MSU employee, and an agent of NCSU.

18. Defendant Wise served as the IR-4 NCR Director and the IR-4 Board Chair from approximately 2015 to approximately 2023. He is now retired.

19. **Defendant Steven Lommel, Ph.D. ("Defendant Lommel")** is a resident of North Carolina. Defendant Lommel was acting under color of law and within the scope of his employment at all times relevant.[5] At all relevant times to this Complaint, Defendant Lommel was employed by as the Associate Dean for the NCSU College of Agriculture and Life Sciences ("CALS"), and he served as the IR-4 Administrative Advisor for the IR-4 HQ at NCSU. Upon information and belief, at all times relevant, IR-4 funded a portion of Defendant Lommel's annual NCSU salary. The allegations in this Complaint relate to Defendant Lommel's conduct as an individual and in his official capacities as the IR-4 HQ Administrative Advisor and an NCSU employee.

20. Defendant Lommel began his IR-4 HQ Administrative Advisor role on or around October 1, 2019. Defendant Lommel was already an NCSU employee before this date.

21. **Defendant Douglas Buhler, Ph.D. ("Defendant Buhler")** is a resident of Michigan. Defendant Buhler was acting under color of law and within the scope of his employment at MSU or agency at NCSU at all times relevant.[6] At all relevant times, Defendant Buhler was employed by MSU and served as the IR-4 NCR Administrative Adviser. Upon information and belief, at all times relevant, NCSU provided IR-4 grant money to MSU to cover the part of Defendant Buhler's salary

---

[5] See *supra* n. 4.
[6] See *supra* n. 4.

for the work he performed as the IR-4 NCR Administrative Advisor. The allegations in this Complaint relate to Defendant Buhler's conduct as an individual and in his official capacities as IR-4 NCR Administrative Advisor, an MSU employee, and an agent of NCSU.

22. **Defendant Does 6 through 100**, inclusive, are individuals and/or business, institutional, educational or corporate entities involved in IR-4, NCSU, Rutgers, or MSU whose true names and capacities are unknown to Plaintiff, who therefore sues these defendants by such fictitious names, and who will amend the Complaint to show the true names and capacities of each such Doe Defendant when ascertained. Each such Doe Defendant bears legal responsibility in some manner for the events, happenings and/or tortious and unlawful conduct that caused the injuries and damages alleged in this Complaint.

## IV. JURISDICTION AND VENUE

23. IR-4, a subunit of NCSU, has had its headquarters address at IR-4 Project, NCSU, 1730 Varsity Drive, Venture IV, Suite 210, Raleigh, North Carolina 27606 since October 1, 2019.

24. Defendants Baron, Carpenter, and Lommel, at all relevant times, were NCSU employees working from the IR-4 HQ at NCSU in Raleigh, North Carolina.

25. Defendants Wise and Buhler, at all relevant times, were working from the IR-4 NCR site housed by MSU in East Lansing, Michigan. Defendants Wise and Buhler's conduct was directed by Defendants Baron and Carpenter from IR-4 HQ in Raleigh, North Carolina.

26. Defendants Wise and Buhler, at all relevant times, were working for and paid by IR-4 HQ, which is hosted by NCSU in Raleigh, North Carolina.

27. The events which gave rise to this action occurred in the City of Raleigh, Wake County, North Carolina.

28. This Court has original jurisdiction over this civil action because it arises under the Constitution and laws of the United States. 28 U.S.C. § 1331.

29. This Court has personal jurisdiction over Defendants Baron and Lommel, who are residents of North Carolina.

30. This Court has specific jurisdiction over Defendants Carpenter, a Pennsylvania resident, and Defendants Buhler and Wise, both Michigan residents, because each of them has purposefully directed their activities at North Carolina by enjoying the benefits of working for and conducting business with IR-4 HQ at NCSU in Raleigh, NC. In addition, Dr. Chen's claims arise out of the specific contacts that Defendants Carpenter, Buhler, and Wise had with North Carolina. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 85 L. Ed. 2d 528 (1985); *Joe Rainero Tile Incorporated v. Young & McQueen Grading Co., Inc.,* 2018 WL 1474085, at *2 (W.D. Va. Mar. 26, 2018, not reported in Fed. Supp.).

31. Venue is properly laid in the Eastern District of North Carolina because a substantial part of the events or omissions that give rise to Dr. Chen's claims occurred in Raleigh, North Carolina. 28 U.S.C.A. § 1391(b)(2).

## V. STATEMENT OF FACTS

32. The facts that follow come in part from emails, meeting minutes, grant applications, and presentations obtained through Freedom of Information Act ("FOIA") requests that were performed long after the events occurred. Facts learned through the FOIA requests are referenced hereafter as "FOIA Documents."

### A. RELATIONSHIP OF NCSU AND MSU VIS-À-VIS IR-4 AND DEFENDANTS' EMPLOYMENT

33. IR-4 is currently headquartered at NCSU, 1730 Varsity Drive, Venture IV, Suite 210,

Raleigh, NC 27606.

34. On October 1, 2019, IR-4 began to move its headquarters from Rutgers, where it had been located since the 1960s, to NCSU. The move took place over two years and it was completed on October 1, 2021.

35. On October 1, 2019, representatives of IR-4, Rutgers, and NCSU signed a Memorandum of Agreement which sets forth the terms whereby the IR-4 would move its headquarters to NCSU for a period of ten years, to end on September 30, 2029. **Ex. 1**. Defendant Baron, who was a Rutgers employee at the time, signed on behalf of IR-4, using the title "Director IR-4." *Id*. Defendant Lommel and three other NCSU employees signed for NCSU. *Id*.

36. On February 24, 2021, NCSU applied for a federal grant of $56 million to fund IR-4 for four years, starting on August 1, 2021 and ending on July 31, 2025. The Grants.gov Tracking Number for NCSU's application is GRANT13304501, and the grant itself is identified as USDA grant number 2021-34383-34848, (hereinafter the "Umbrella Grant").

37. The Umbrella Grant application provides that NCSU would pay the IR-4 regional host institutions for the costs associated with running IR-4 projects, including the regional staff salaries. It lists NCSU as the "Performance Site Primary Location," and the regional IR-4 host institutions are each called a "Performance Site Location." For example, MSU is "Performance Site Location 1."

38. This was a new financing model for IR-4. Before the Umbrella Grant, each host institution held its own direct grant. For example, MSU held its own independent IR-4 direct grant, and the IR-4 NCR staff, including Dr. Chen, Defendant Wise, and Defendant Buhler, were paid with federal funds awarded directly to MSU.

39. Sometime before February 24 Umbrella Grant application was submitted, MSU and NCSU came to a mutually acceptable agreement whereby NCSU agreed to pay MSU using the federal grant money for costs associated with hosting the IR-4 NCR site, including paying for Dr. Chen, Defendant Wise, and Defendant Buhler's IR-4 related services.

40. The Umbrella Grant application submitted by NCSU expressly puts Dr. Chen forward to serve in the IR-4 NCR QA role at least until August 2024. **Ex. 1**, 13-15.

41. The Umbrella Grant was awarded to NCSU on or around August 16, 2021.

42. Defendant Lommel began his role as the IR-4 HQ Administrative Advisor on or around October 1, 2019, with the signing of the Memorandum of Agreement.

43. Defendant Baron was hired by NCSU on January 1, 2020, and continued in his role as IR-4 Executive Director.

44. Defendant Carpenter was hired by NCSU on or around July 2021, and assumed the role of IR-4 Associate Director on October 4, 2021.

45. On or around August 16, 2021, Defendants Wise and Buhler continued their roles as the IR-4 NCR Director/Board Chair and the IR-4 NCR Administrative Advisor as MSU employees. However, on this date, MSU paid them for this work using pass-through funds that originated at NCSU and flowed to MSU. *Id.*

### B. IR-4's Regulatory Framework

46. IR-4 obtains these marketing permits by conducting and submitting safety studies to the EPA on behalf of pesticide registrants, pursuant to the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") and section 408 or 409 of the Federal Food, Drug and Cosmetic Act ("FFDCA").

47. ISK Biosciences Corporation is the registrant of flonicamid, the pesticide at issue here, which is sold as the end-use products Beleaf™ 50SG (EPA Reg. No. 71512-10) and Flonicamid 50WG (EPA Reg. No. 71512-9).

48. The safety studies that IR-4 conducts must satisfy the regulatory requirements detailed in 40 CFR §158. These safety studies must be conducted in accordance with the quality criteria known as GLP or GLPs, which have been promulgated as regulations in 40 CFR §160.

49. FIFRA is the statutory authority for both 40 CFR §§158 and 160.

50. Certain roles and responsibilities for individuals involved in conducting safety studies are defined in 40 CFR §160. In part, these include: (1) a "study director" who is "the single point of study control" and is responsible for interpreting the safety data; (2) QA, who is responsible to "assure management" that studies are conducted in compliance with the GLP standards; (3) "test facility management" who must adequately resource the work and ensure that corrective actions are taken if QA reports compliance issues; and (4) the "sponsor" who financially supports the study and submits studies to EPA. 40 CFR §§160.3, 160.31, 160.33, 160.35.

51. Under 40 CFR §160.35(a), "[f]or any given study, the QA unit shall be entirely separate from and independent of the personnel engaged in the direction and conduct of that study." EPA has interpreted this regulation to mean that "members of the QA unit cannot work on any aspect of a study, *even in an advisory capacity*" (emphasis added). US EPA, *GLP Regulations Advisory No. 52*, D. Dull, Oct. 16, 1992. In simple terms, QA can only observe, document, and report what they see to management. They must not interfere with the study in any way. QA does not make study decisions, remedy GLP compliance issues, or decide what data to submit to EPA. These are responsibilities of the study director and the sponsor.

52. A GLP compliance statement must accompany all safety data submitted to EPA. 40 CFR §160.12. The statement must indicate that the study was conducted in accordance with the GLP standards, or note any exception to these regulations. *Id.* The GLP compliance statement must be signed by the sponsor and the study director; QA does not sign. *Id.*

53. Submission of a false GLP compliance statement to EPA can result in criminal prosecution or civil penalties. 40 CFR §160.17.

54. At all times relevant, IR-4 staff responsible for conducting the safety studies, including Defendants Baron, Carpenter, Wise and Chen, were subject to compliance with 40 CFR §160.

55. At all times relevant, the roles as defined under federal law for the parties in this matter are as follows. Dr. Chen was QA, IR-4 was sponsor, Defendant Wise was test facility management, and Defendants Baron and Carpenter were both test facility management and sponsor. 40 CFR §§160.3, 160.31, 160.33, and 160.35.

### C. Dr. Chen's Work History from 2000 to 2015

56. From 2000 to 2015, Dr. Chen performed the GLP QA duties at the IR-4 NCR lab.

57. At all times relevant, Dr. Susan Erhardt was the head of the IR-4 NCR lab and was subject to compliance with the GLPs. 40 CFR §160. Dr. Erhardt was an MSU employee in a position funded by IR-4.

58. As QA, Dr. Chen's job was to monitor Dr. Erhardt's work and report any GLP compliance issues to Defendant Wise, who served as local test facility management at IR-4 NCR.

59. Beginning on or around 2014, Dr. Chen observed some troubling GLP compliance issues and reported them to Defendant Wise. However, Defendant Wise failed to correct the issues,

and they continued and compounded over time.

60. In April 2015, Dr. Chen became increasingly concerned that Defendant Baron was unaware of the significant GLP issues, and that in his role as GLP sponsor, he was unknowingly signing false GLP compliance statements. Dr. Chen decided to reach out.

61. On April 27, 2015, Dr. Chen sent an email with a letter attached to Defendants Baron and Wise detailing a series of material, significant GLP violations that impacted numerous safety studies which had already been, or soon would be, submitted to the US EPA. Some violations Dr. Chen reported included using moldy samples and expired standards in safety studies and routinely cherry-picking data to present only the most favorable results. If EPA discovered these issues, it would have an adverse impact on existing pesticide marketing permits and could result in civil or criminal penalties for IR-4 and its staff.

62. In this April 27, 2015 communication, Dr. Chen stated and asked, "Since our QAU raised many critical findings to the lab [o]ur relationship with the lab was detrimental, unpleasant, and occasionally uncivil. We can't do this or maintain this relationship forever. **If these issues were not solved or the management took the approach of inactivity, we will ultimately need to back off and cope with them (i.e., silence off). Is this the management's expectation for us?"**

63. In May 2015, Defendant Baron emailed his acknowledgement for the seriousness of the problems raised, yet he took no steps to correct them.

64. Instead, in late 2015 or early 2016, Defendant Wise re-assigned Dr. Chen to the field program and forbid him to access to the lab and any lab data.[7] By this conduct, Dr. Chen understood

---

[7] Regulatory safety studies for pesticides have a field phase, where crops are grown in field and sprayed with the pesticide, and a laboratory phase, where samples of these treated crops are

that Defendants Wise and Baron wanted to "silence" Dr. Chen from making findings about the poor quality of data generated by the IR-4 NCR lab.

65. Upon information in the FOIA Documents and belief, Defendant Baron directed Defendant Wise to remove Dr. Chen from the lab and restrict Dr. Chen's access to the lab's data.

66. At the time of the re-assignment, Dr. Chen was told the reason for the move out of the lab was to manage workload better.

67. Around this same time, Defendant Carpenter was the study director for one of the studies that Dr. Chen had audited. Dr. Chen found many serious problems with the analytical data used in this study. When the pesticide registrant who authorized the study learned of these problems, they decided not to allow IR-4 to submit it to the EPA. Upon information and belief, this occurrence was embarrassing to both Defendants Carpenter and Baron, and had a considerable negative impact on their reputation with other industry constituents.

### D. Dr. Chen Finds Frequent Improper Manual Integrations in 2014 and 2015

68. Manual integration means a human intervenes to edit, change, or manipulate data that was normally collected automatically. Manual integration is only rarely needed, and is properly used only to correct glaring errors in the software output.

69. Manual integration is vulnerable to misuse and can result in data manipulation or falsification.

70. Under federal law, any manual change to data normally collected automatically, such as a manual integration, is permitted. However, the scientist who performed the work must document

analyzed to determine the amount, or "residue" of pesticide present. The GLPs require QA inspections of both the field and lab phases.

it and provide a reason for the manual change. 40 §CFR 160.130(e).

71. In 2014 and 2015, Dr. Chen found that frequent and improper manual integrations were being performed in the lab. At this time, the lab instrument printed out a code which showed that the manual integration was done. However, the lab staff failed to record the reason for the manual integration, in violation of 40 §CFR 160.130(e).

72. When Dr. Chen was removed from the lab in late 2015 / early 2016, the instrument code which showed manual integration, was turned off. This made it challenging for an inexperienced QA auditor to know if there were manual integrations or not.

73. After Dr. Chen was removed from the lab in late 2015 / early 2016, Lisa Latham ("Ms. Latham"), a new and less experienced QA auditor who had only joined IR-4 NCR in October 2014, was assigned by Defendant Wise to perform all of the QA duties for the IR-4 NCR lab.

74. Dr. Chen remained as the IR-4 NCR QA Director; however, he was no longer permitted to do lab audits or allowed in the lab. His duties were restricted to field audits and guiding Ms. Latham, who was his subordinate.

### E. THE NEW LAB QA AUDITOR ALSO FINDS GLP ISSUES STARTING IN 2015, ESTABLISHING THAT DEFENDANTS BARON, CARPENTER, WISE, AND BUHLER WERE INCOMPETENT TO CONDUCT THE REGULATED PESTICIDE SAFETY STUDIES.

75. Ms. Latham began auditing the IR-4 NCR lab in 2015. Between April 2015 and January 2021, Ms. Latham's audits revealed a systematic disregard for the GLP regulations at the IR-4 NCR lab.

76. For example, Ms. Latham's audits of several pesticide safety studies found numerous significant deviations from the GLP regulations. These included, but were not limited to: (1) failing

to explain or document critical manual integrations; (2) failing to properly store or label solutions and test samples; (3) using expired reference substances and solutions; (4) failing to record which lab instruments were used for certain measurements; (5) failing to maintain key lab instruments used for certain measurements; (6) failing to properly record original raw data; and (7) failing to record and report deviations from the required GLP Standard Operating Procedures for the lab. 40 CFR §§160.63, 160.81, 160.83, 160.105, 160.107, 160.130.

77. In response to these findings, Dr. Erhardt would provide her own interpretation of past events, even when they occurred many months, or even years earlier, and the work was performed by others in the lab.

78. The GLP compliance statements in the final reports for these problematic studies falsely report no GLP deviations during the analytical phase at IR-4 NCR. However, these same studies would often include inconsequential deviations in the field phase, giving the misleading appearance that IR-4 was following the law.

79. As one example, Ms. Latham audited one of the studies that Dr. Chen had warned Defendant Baron about in his April 27, 2015 email. Ms. Latham's audit found many significant GLP deviations, including failures of lab staff to record the original raw data, use of expired standards, and unexplained manual integrations. **Ex. 2**. In one finding, Ms. Latham questioned a manual integration which added peak area to a quality check sample called a "recovery" sample. *Id.* at 7. Adding area, or "peak enhancement," is considered laboratory fraud by EPA. *See Report of the Laboratory Fraud Work Group (w/June 2002 Update)*, EPA Publ. No. 310R01001, at 6; available online at https://nepis.epa.gov/ search term 310R01001. Dr. Ehrhart's response to this finding was an unsupported claim that the recovery results were unaffected, and that she "believe[d] it was a XXX

call." **Ex. 2** at 7.

80. Despite the warnings from Dr. Chen and Ms. Latham's critical audit, Defendant Baron signed a false GLP compliance statement for this study in 2016. *Id.* at 2. As was typical for IR-4 at this time, the only GLP deviations admitted were those which occurred during the imprecise, inconsequential measurements taken in the field, and none of the significant GLP deviations that occurred at the IR-4 NCR lab were disclosed. *Id.*

81. Ms. Latham often discussed her concerns about the low-quality data with Dr. Chen. Dr. Chen advised her to share her findings with Defendant Baron. However, Dr. Chen recalls that when she did this, Defendant Baron instructed Ms. Latham to mind her own business.

82. After this, Ms. Latham was fearful of retaliation, so instead of bringing her concerns to Defendants Baron or Wise, she simply recorded her GLP findings in her audits and took no further action, even when lab staff failed to remedy the issues.

83. Dr. Chen, on the other hand, as the senior QA staff member, felt a greater responsibility. He had been performing QA audits at the IR-4 NCR lab since 2000. What was going on in the lab starting in 2014 concerned him gravely. He thought the low-quality data from the lab could be impacting public health and if discovered, would destroy IR-4's reputation.

84. Dr. Chen, whose office was near the lab, would often overhear the lab analysts consult with Dr. Erhardt, during the conduct of GLP studies, on using manual integrations to manipulate the data in order to achieve acceptable results.

85. Dr. Chen brought his concerns to Defendant Buhler on October 15, 2018. On this date, Dr. Chen met in person with Defendant Buhler and informed him of the lab's GLP violations, the intentional data fraud and manipulations, and the lab staff's overall negligence. Dr. Chen also

informed Defendant Buhler that he had already discussed this with Defendant Wise, but no corrective measures were taken. Defendant Buhler listened and then warned Dr. Chen that if they opened an investigation and it did not support his claims, Dr. Chen would "have a hard time ahead" in his job. No investigation was ever opened.

86. At this point, Dr. Chen had personally reported the significant GLP issues at the IR-4 NCR lab to Defendants Baron, Wise, and Buhler.¶¶ 61-63, 85. Still, there were no improvements in the lab. Seeing no path forward that allowed him to keep his job, Dr. Chen remained silent and focused on his field audits.

### F. DEFENDANTS BARON, CARPENTER, AND WISE GIVE LIP SERVICE TO GLPS IN 2020

87. Publicly, Defendants Baron, Carpenter, and Wise gave lip service to their concern to comply with federal laws.

88. For example, in February 2020, Defendants Wise and Baron gave a presentation to other IR-4 leaders, wherein they discuss two "major issues aris[ing] around adherence to Good Laboratory Practices (GLP's)" and stress the importance of complying with the law because not doing so may cause the loss of "all our jobs;" there is no mention of impacts on public health. [8]

89. At this same February 2020 conference, Defendant Carpenter gave a presentation to lab staff on the data quality issues wherein she states **the analyst "[m]ust acknowledge the manual integration" and "must have the ability to explain" why it was done; furthermore, the "[e]lectronic file must contain the chromatogram before manual integration**.[9] See *Infra*, ¶107.

---

[8] IR-4 Project, *State of IR-4 J. Baron – J. Wise*, 2020, https://www.ir4project.org/workshops-and-events-2/presentation-archive/2020-national-education-conference/ (last visited on Sept. 27, 2025).

[9] *Id*. at *Lab session_Issues in Data Quality*, 2020.

Defendant Carpenter, as a Ph.D. chemist, has a specialized understanding of the proper use of manual integrations.

90. Dr. Chen was not invited to either of these presentations.

## G. The Events Which Led to Dr. Chen's Firing in November 2022.

91. In January 2021, Ms. Latham resigned due to illness. In her absence, Dr. Chen was assigned the task of auditing a study report concerning the use of the insecticide flonicamid on pomegranates. The flonicamid/pomegranate study report included analytical data.

92. On January 22, 2021, Dr. Chen corresponded by email with Defendant Baron, Defendant Wise, and Dr. Johanna Mazlo, the IR-4 National Quality Assurance Unit Manager, regarding his restriction on accessing the original analytical raw data stored in the lab, such as the data on the lab instruments. Dr. Chen was concerned that he could not properly audit the study without access to this data. In this correspondence, Defendant Wise instructed Dr. Chen to ask Dr. Ehrhart for the raw data stored in the IR-4 NCR GLP archives to perform his audit.

93. In February 2021, Dr. Chen completed his audit and recorded a finding that manual integrations were performed without any explanation on various control, standard, and treated samples. The samples at issue were analyzed between May and August 2020.

94. Dr. Chen made this finding because the chromatographic peaks in the data looked messy, giving it the appearance that they were manually integrated, but no explanation was provided.[10]

---

[10] An LC/MS/MS makes a "chromatogram" which is a trace of the output. This chromatogram has peaks and valleys in response to the amount of pesticide present in the food sample. The chromatograms here were considered messy because there were interfering peaks and the integrations, shown by shading on the peaks, were not uniform. This gave the appears that the

95. Dr. Chen made this finding on chromatograms included in the flonicamid / pomegranate final report. These chromatograms are true copies of the exact same data stored the IR-4 NCR GLP archives. Ms. Kumar, the analyst, initialed and dated the chromatograms to prove they were true copies.

96. Pursuant to 40 CFR §160.35, Dr. Chen properly reported the manual integration finding in an audit provided to Defendant Carpenter, who was management for this study.

97. Dr. Chen's GLP compliance findings regarding the quality of the pesticide safety data is speech that is a matter of public importance and is highly protected. U.S. Const. amend. I; *Pickering,* 391 U.S. at 573.

98. Defendants Baron, Carpenter, and Wise's obligation as test facility management was to "[a]ssure that any deviations from [the GLP] regulations *reported by the quality assurance unit* [i.e., Dr. Chen] [were] communicated to the study director and *corrective actions [were] taken and documented*." 40 CFR §160.31(g) (emphasis added).

99. Defendants Baron and Carpenter's obligation in their role as sponsor was to ensure the GLP compliance statements in all studies submitted to EPA by IR-4, including the pomegranate study, were accurate and truthful. 40 CFR §160.12.

100. Dr. Chen had no authority to resolve the finding or interpret its impact on the study. This is the role of the study director pursuant to 40 CFR §160.33.

101. Nevertheless, beginning on the afternoon of March 2, 2021, Defendant Carpenter began a flurry of emails pressing Dr. Chen to explain and somehow resolve this finding. This barrage

---

integrations were done by hand, and not automatically by the machine. Manual integrations of interfering peaks leads to inaccurate results.

of emails, which continued through the weekday evenings and over the weekend of March 6-7, 2021, were sent to Dr. Chen, Defendant Baron, Defendant Wise, Dr. Erhardt, and others.

102. During this exchange, Dr. Chen stated that his finding was based on his experience as a lab auditor, and his knowledge of what a manual integration looks like on visual inspection. Further, Dr. Chen stated that he would close the finding as satisfied if Dr. Erhardt confirmed no manual integrations were performed. Providing this explanation and path forward fulfilled Dr. Chen's duties under 40 §CFR 160.35.

103. Dr. Chen knew that Ms. Latham had previously audited the analytical raw data. However, since he was the more senior auditor and there was a considerable amount of data, he made the reasonable assumption she may have missed the manual integrations.

104. On March 3, 2021, Dr. Erhardt admitted that visually, the data looked messy, which may have misled Dr. Chen, but she did not perform the work herself. Dr. Erhardt stated that no manual integrations were performed based on the alleged fact that the analyst, Sima Kumar, who performed the work "does not know how to do manual integrations." However, in a different study where work was done *before* the pomegranate study, Dr. Erhardt approved of Ms. Kumar's manual integrations, even though, allegedly, she did not know how to perform them.

105. Dr. Erhardt also adds in a March 2, 2021 email that "Michael [Dr. Chen] is just being a jerk again."

106. Remarkably, even though Defendant Carpenter clearly stated that she trusted Dr. Erhardt's word, she continued almost frantically to pressure Dr. Chen for an explanation.

107. **Defendant Carpenter, with her specialized knowledge of how manual integrations were performed, knew that her request to Dr. Chen was nonsensical because the**

**original data was in the electronic file stored on the lab instrument and only the analyst, not Dr. Chen, could explain any manual integration performed**. *Supra* ¶89.

108. Dr. Chen was not copied on all of the March 2-7 email flurry. Side conversations, which Dr. Chen found in the FIOA documents, revealed a mounting annoyance by Defendants Baron and Carpenter.

109. On Monday morning, March 8, 2021, Defendant Baron joined in with Defendant Carpenter's unreasonable pressure campaign. He sent an email to Dr. Chen and several MSU and IR-4 staff, demanding that Dr. Chen explain himself.

110. On the evening of March 8, 2021, Defendant Baron sent an email to Defendant Wise and others at MSU. Dr. Chen was not included. Dr. Chen found the email in the FOIA Documents. Defendant Baron expressed his desire to have Dr. Chen removed from IR-4 NCR, with a contrived reason that he is a poor QA auditor. Defendant Baron wrote:

> "For the most part IR-4 has maintained a culture of not interfering with the HR issues of other units. Unfortunately, *we can no longer sit back and tolerant Michael Chen substandard work* in the analytical summary reports and final report audits. ….Debbie [Defendant Carpenter] and others are great in documenting situations, and I would be happy to send you detailed nots on why we have lost confidence in Michael. As you know, we spoke about this situation in the past during Executive Sessions at the [IR-4 Board] meeting. *I would like to discuss the path forward the NC Region QA during the Executive Session as IR-4 and potentially other IR-4 units no longer have the resources to cover for*

*him*" (emphasis added).

111. The study director was on copy on most of the March 2-7 emails, but he remained silent. It was not until later, on March 15, 2021, that the study director sought guidance from Defendant Carpenter on how to fix the issue. Defendant Carpenter replied that she had a "plan." [11]

112. The FOIA Documents reveal that Defendant Carpenter's plan was to create a false narrative that Dr. Chen did not properly audit the study, and that he should be fired for cause.

113. First, Defendant Carpenter intentionally misled others at IR-4 and MSU by manufacturing a false narrative that Dr. Chen failed to properly perform his audit because he made his finding on the chromatograms in the final report, and not on the paper-copy stored in the IR-4 NCR GLP archives. However, Defendant Carpenter knew that the chromatograms Dr. Chen was looking at were identical to those stored in the IR-4 NCR GLP archives. *Supra* ¶95.

114. In addition, Defendant Carpenter intentionally misled others at IR-4 and MSU by inventing a story that Dr. Chen failed to audit the study properly because he, allegedly, did not look at control and standard samples. *Infra* ¶122. This was false. *Supra* ¶¶93, 96.

115. Defendants Baron and Carpenter acknowledged that Dr. Chen's manual integration finding was very serious and would impact the validity of the study.

116. Defendants Baron and Carpenter knew that by sweeping the manual integration issue under the rug, there would be no need to reanalyze samples or repeat the study. That would have

---

[11] This shows that Defendant Carpenter, not the study director, was in full control of the study at this point. The roles in the GLP regulations were designed to remove conflicts of interest, and allow study directors to make sound scientific decisions, free from the worries of budgets and deadlines. Ironically, while Dr. Chen was accused of dereliction of duty, Defendant Carpenter was clearly overstepping her GLP role, in violation of 40 CFR § 160.33.

caused a significant delay in finishing the work.

117. Upon information and belief, Defendant Carpenter instructed the study director to not investigate, and to simply accept the data.

118. On March 15, 2021, Defendant Carpenter put a written note in the QA audit for the pomegranate study that any potential GLP issues were Dr. Chen's fault. Defendant Carpenter knew her note was false because she knew that Dr. Chen had faithfully fulfilled his duty as QA, pursuant to the GLP regulations. 40 CFR §160.35.

119. On March 16, 2021, the study director, Ken Samoil, put a written note in the QA audit for the pomegranate study stating, "I accept the lab director's response that no manual integration had been done. No further action is needed from the lab." Dr. Samoil blindly accepted Dr. Erhardt's statement, made almost one year after the work was performed by someone else, that no manual integrations were performed in this study. *Supra* ¶104.

120. A meeting was held on March 17, 2021 about Dr. Chen. The minutes are in the FOIA Documents. Defendants Baron and Carpenter, and several IR-4 and MSU staff were present, including Dr. Mazlo. Dr. Chen was not present.

121. During the March 17, 2021 meeting, both Defendants Baron and Carpenter proclaimed they felt at risk of violating federal law if Dr. Chen were allowed to continue his QA work because he, allegedly, could not perform proper audits. With some drama, Defendant Baron falsely claimed he feared signing false GLP compliance statements, and that he was worried about criminal and civil penalties.

122. At this same March 17 meeting, Defendant Carpenter stated to the group "I expected [Michael] to look at the control, standards, etc., and he didn't do that." Defendant Carpenter knew

that her statement was false, and was made to mislead others in the group. As above, Dr. Chen had provided the manual integration finding directly to Defendant Carpenter, and it expressly referenced control, standard, and treated samples. *Supra* ¶¶93, 96.

123. At this meeting, Dr. Mazlo recommended another audit of the flonicamid pomegranate study and warned that because EPA relies on the data to set tolerances, it may "come back to bit[e] you or IR-4 or NCR." Another audit of the report was done by an IR-4 QA auditor located at IR-4 HQ in Raleigh, NC. However, the original electronic data on the lab instrument was not looked at in this audit.

124. Defendant Carpenter then signed the GLP Compliance Statement on June 16, 2021. It falsely states that "[a]ll analytical data included in this report was developed under GLP." There is no disclosure that the study director blindly accepted a statement made by Dr. Erhardt, almost one year after the work was performed by someone other than herself, that no manual integrations were performed in this study; and that Dr. Erhardt's assurance was based on the highly suspect assertion that the analyst did not know how to do manual integrations. *Supra* ¶¶104, 119.

125. Under pressure from Defendants Baron and Carpenter, Defendant Wise reported a contrived "unprofessional conduct" narrative to the MSU human resources department ("HR"), intent of getting Dr. Chen fired for cause.

126. Defendant Buhler, also under pressure from Defendant Baron, assisted and supported Defendant Wise by analyzing the MSU policies and advising him on how to approach MSU HR so that they would terminate Dr. Chen.

127. Both Defendant Buhler and Wise knew that the "unprofessional conduct" narrative about Dr. Chen was false at the time it was reported to MSU HR.

128. After MSU HR investigated the false claim from March 30 to May 1, 2021, they concluded it was unfounded.

129. On May 6, 2021, Defendant Wise, again under significant pressure from Defendants Baron and Carpenter, gave Dr. Chen his a false "does not meet expectations" performance review. This was the first and only time in his 20+ year career at MSU that he had a poor performance review.

130. Confused by this negative feedback, given with no instruction on how to correct his allegedly poor performance, Dr. Chen started to experience symptoms of severe emotional distress, including insomnia, anxiety, and depression.

131. Defendants Wise, Carpenter, and Baron were aware of Dr. Chen's severe emotional distress when it first occurred. They were informed that he needed medical leave to deal with the distress.

132. Dr. Chen received medical treatments for his severe emotional distress.

133. On September 23, 2021, after the failed attempt to have Dr. Chen fired for cause, Defendant Baron called a special meeting of the IR-4 Board. At this meeting, Defendant Baron laid the groundwork to remove funding for Dr. Chen's position at IR-4 NCR. Defendant Wise chaired the meeting, and Defendant Carpenter was an invited guest. Defendants Baron, Carpenter, and Wise's worked together to achieve a favorable vote from IR-4 Board at the upcoming Fall 2021 meeting to give Defendant Baron full authority over QA assignments and funding.

134. Defendant Baron also began campaigning to close the IR-4 NCR lab around this same timeframe. Meeting minutes, found in the FOIA Documents, showed that IR-4 staff not directly involved in the matter questioned the decision. There was a back-up of lab samples, and

money would be needed for contract work. It did not make sense. Still, Defendant Baron used his power and influence to push the idea forward.

135. Other communications found in the FOIA Documents show that Defendant Baron, as Executive Director, often used his position of authority to exert power and influence over the decisions made by the IR-4 Board.

136. On October 28-29, 2021, there was a regular Fall meeting of the IR-4 Board. Defendants Baron, Carpenter, Wise, Lommel, and Buhler were all present.

137. At the October 28, 2021 meeting, Defendant Baron campaigned heavily to cut off funding for Dr. Chen's position. At one point, he stated "I am not supportive of funding Michael Chen anymore" due to alleged poor performance issues. Defendant Baron also stated he wanted to take out "one bad apple" from the funding to IR-4 NCR, alluding to Dr. Chen.

138. At the October 29, 2021 meeting, a motion was made to allow IR-4 HQ, i.e., Defendant Baron, full authority to make all decisions regarding QA staff assignments and funding**.** In addition, a motion was made to close down the IR-4 NCR lab. Both motions passed by a vote of the IR-4 Board.

139. Thus, on October 29, 2021, the IR-4 Board took the power to make decisions regarding the payment of Dr. Chen's salary from NCSU and gave it to Defendant Baron as IR-4 Executive Director.

140. IR-4 Board did not have the authority to change NCSU and MSU's agreement regarding the Umbrella Grant funding of Dr. Chen's position. *Supra* ¶¶37-39.

141. However, Defendants Lommel and Buhler, as the IR-4 HQ and IR-4 NCR Administrative Advisors and representatives of NCSU and MSU, respectively, authorized, and

ratified IR-4 Board's October 29 votes and thereby bound NCSU and MSU to the new terms.

142. Defendants Lommel and Buhler are on the IR-4 Board, but are not voting members.

143. In November 2021, Defendant Baron formally announced in a letter to Defendants Wise and Buhler that the IR-4 funding for Dr. Chen's position at MSU would end in November 2022. Defendant Lommel was copied on this letter.

144. Dr. Chen was given no opportunity to be heard when the funding for his position ended.

145. Dr. Chen, as a public employee of MSU, had a constitutionally protected property interest in his employment. U.S. Const. amend. XIV; *Hatley*, 826 F.Supp.2d at 898.

146. Due to Defendant Wise's May 6, 2021 poor performance review of Dr. Chen that was recorded at MSU HR, and Defendant Baron's clear assertion that IR-4 would no longer pay Dr. Chen's salary under any circumstance after November 2022, Dr. Chen was not considered for any other open positions at IR-4 NCR or MSU.

147. Even though funding was cut for Dr. Chen's position, IR-4 hired two new QA auditors at IR-4 HQ / NCSU and a new Field Director at IR-4 NCR / MSU during this same timeframe. The Umbrella Grant was used to pay for these three positions. Dr. Chen was more than qualified to fill any of them.

148. In July 2022, all GLP analytical activities at the IR-4 NCR lab were shut down. Based on information and belief, the analytical data from the instruments at that lab have been discarded or are in unprotected locations where they can be deleted, in violation of federal law. 40 CFR §169.2, 7 U.S.C. §§136f and 136j.

149. Defendant Baron publicly stated that the October / November 2021 decisions to stop

funding Dr. Chen's position and to close the IR-4 NCR lab were due to a shrinking budget. However, IR-4's funding actually *increased* between 2021 and 2022 by over $3 million.

150. In addition, internal IR-4 emails and presentations from 2025 found in the FOIA Documents confirm that the IR-4 NCR lab was actually shut down because of the poor work quality, not budget reasons. As one example, Defendant Carpenter reported in a July 2025 presentation that "Resources still being used to address quality of data for MIR," where MIR means the IR-4 NCR lab at MSU.[12] In addition, FOIA Documents show that IR-4 is still struggling, three years later, with a significant backlog of sample analysis created by the untimely closure of the IR-4 NCR lab.

### H. DEFENDANTS' WRONGFUL CONDUCT CAUSED DR. CHEN'S DAMAGES

151. At the time of Dr. Chen's termination in November 2022, he was a mere two and a half years away from retirement. Because he never reached his retirement date, he was not eligible to receive any of his retirement benefits.

152. Instead of abiding by federal law, Defendants Baron and Carpenter, assisted by Defendants Wise and Buhler, ensured that Dr. Chen could never again work for IR-4 or MSU. In addition, they shut down the IR-4 NCR lab and discarded raw data from the IR-4 NCR lab instruments in order to destroy the incriminating evidence that had been mounting since 2014, when Dr. Chen first reported it.

153. Defendant Lommel, as Defendant Baron's supervisor and the IR-4 HQ Administrative Advisor, approved of or ratified Defendants Baron, Carpenter, Wise, and Buhler's wrongful conduct.

---

[12] *See* IR-4 website for codes used for the analytical lab at https://ir4app.cals.ncsu.edu/Ir4FoodPub/maScheduleSearch.

154. At all times relevant, Defendants Baron, Wise, Carpenter, Lommel, and Buhler knew that it was a violation of federal law to submit a GLP magnitude of the residue study to the US EPA with false data or a false GLP compliance statement. 40 CFR §§160.12 and 160.17.

155. At all times relevant, Defendants Baron, Wise, Carpenter, Lommel, and Buhler knew that it was a violation of federal laws to retaliate against or otherwise try to silence a GLP QA auditor from reporting their findings in a GLP residue study, as required under 40 CFR §160.

156. At all times relevant, Defendants Baron, Carpenter, Wise, Lommel, and Buhler each understood the impact on public health if the pesticide safety studies were not conducted properly and knew their actions were unlawful.

157. Information in the FOIA Documents reveals that Defendant Baron was very sensitive to budget and timeline pressures from his industry constituents, and that he found Dr. Chen's GLP compliance findings a nuisance and a waste of time.

158. Even after Dr. Chen was let go, Defendant Baron, under Defendant Lommel's continued supervision, has maintained his indifference to his obligations under federal law. As one example, in a document written in 2025 by Defendant Baron, he states that IR-4 has lost 40 boxes of pesticide safety data during the move from Rutgers to NCSU and that no one has told EPA because he is"[c]urrently assessing if they can ***rebuild*** the supporting data." Pesticide safety data cannot legally be "***rebuilt***." Federal law requires that all underlying raw data, meaning the record of the "*original observations*" supporting the registration of the pesticide, must be kept for the life of the product. 40 CFR §§160.3, 160.195(b), 169.2(k). Furthermore, federal law requires that pesticide safety data must be stored in a manner that allows for expedient retrieval. 40 CFR §160.190(b). The move to NCSU occurred between 2019 and 2021. In 2025, the boxes of data had been lost for at least

four years; this is not storage of data in a manner that allows for expedient retrieval.

159. Under Defendant Lommel's supervision, Defendants Baron, Carpenter, and Wise engaged in a wrongful smear campaign and attempted to strong-arm MSU HR to fire Dr. Chen for cause in Spring 2021. Defendants Buhler and Wise were pressured by Defendants Baron and Carpenter to find any means at all to fire Dr. Chen. Defendant Buhler assisted Defendant Wise in this effort by instructing him on what to say to ensure that MSU HR would open an investigation into Dr. Chen, even though Defendant Buhler knew the reasons for the investigation were false.

160. When MSU HR investigated and found no reason to fire Dr. Chen, Defendants Baron and Carpenter continued to unlawfully wield their power to destroy Dr. Chen's reputation at MSU. Defendant Wise, yielding to the pressure, gave Dr. Chen a baseless poor performance review on May 6, 2021. Dr. Chen, in all his years at IR-4 NCR, had never before received a poor performance review.

161. IR-4 Defendants also abused their power by removing the IR-4 funding for Dr. Chen's position.

162. Defendants Baron, Wise, Carpenter, Lommel, and Buhler's conduct shows a conscious disregard for public health and federal laws.

163. Agreements between IR-4, NCSU, and MSU provide that Dr. Chen's employment in the QA role for IR-4 NCR was to last until at least August 2024. *Supra* ¶40.

164. Defendants Baron, Carpenter, Wise wrongfully interfered with these agreements when they conspired to influence IR-4 Board to vote in favor of granting Defendant Baron the power to shut down the IR-4 NCR lab and terminate Dr. Chen's funding. This wrongful interference was approved of and ratified by Defendants Lommel and Buhler.

165. Defendants Baron, Carpenter, Wise, Lomel, and Buhler did this in order to permanently silence Dr. Chen and cover up his findings of low-quality data that IR-4 submitted to EPA to obtain pesticide registrations for various industry members.

166. It was deceitful and unjustifiable when Dr. Chen was told by Defendants Baron, via Defendant Wise, that his position at MSU was losing its IR-4 funding in 2022 due to budget concerns, when the real reason was to silence Dr. Chen from his repeated reports of the low-quality data coming out of the IR-4 NCR lab. Defendants Baron and Wise knew at the time they made this statement that it was false. Defendant Lommel approved of this false communication.

167. Dr. Chen had no opportunity to be heard when the funding for his position was terminated.

168. It was deceitful and unjustifiable when Defendants Baron, Carpenter, and Wise unlawfully covered up Dr. Chen's valid, well-founded findings of serious GLP violations in the flonicamid/pomegranate report.

169. The cover-up affects commerce because it calls into question the validity of the marketing permit for flonicamid on pomegranates.

170. Defendants Baron, Wise, and Buhler additionally unlawfully failed to resolve any of the GLP compliance issues Dr. Chen reported to them in 2015 and 2018. Instead, these issues were covered up. This calls into question the validity of numerous other pesticide marketing permits that are based on flawed safety data generated since 2014/2015 by the IR-4 NCR lab.

171. Defendants Baron, Carpenter, Wise, and Buhler knew at the time they were covering up Dr. Chen's findings that their conduct was unlawful.

172. Defendants Baron, Carpenter, Wise, and Buhler knew at the time they destroyed the

raw data in the IR-4 NCR lab, that this was unlawful.

173. Defendant Lommel knew or should have known, as the IR-4 HQ Administrative Advisor, Defendant Baron's supervisor, and the Associate Dean of NCSU CALS, that Defendants Baron, Wise, Carpenter, and Buhler were involved in a cover-up by shutting down the lab and firing Dr. Chen, and yet he approved of or ratified these wrongful decisions anyway.

174. Dr. Chen has suffered economic losses and severe emotional distress as a result of these wrongful actions.

175. Based on these facts, all elements have been met to hold Defendants Baron, Carpenter, Wise, Lommel, and Buhler are liable to Dr. Chen for damages arising from their violations of his constitutional rights to free speech and due process, and civil conspiracy. U.S. Const. amend. I, XIV; 42 U.S.C. §§1983, 1985.

176. Dr. Chen's last day of work with IR-4 NCR was November 18, 2022. This is the date the claims in this action accrued.

## VI. CAUSES OF ACTION

### COUNT 1 – FREE SPEECH:

### DEFENDANTS BARON, CARPENTER, WISE, LOMMEL, AND BUHLER ARE LIABLE TO DR. CHEN UNDER 42 U.S.C.§1983 FOR VIOLATING HIS U.S. CONST. AMEND. I RIGHT TO FREE SPEECH.

177. Plaintiffs repeat the allegations contained in all paragraphs above.

178. The intentional violation of a person's Constitutional rights by a party acting under color of law gives rise to an action under 42 U.S.C.§1983.

179. The Constitutional right to freedom of speech under U.S. Const. amend. I is highly protected when the speech is on matters of public importance. *Pickering*, 391 U.S. at 573.

180. Sovereign immunity is not a defense against §1983 actions. *Corum*, 413 S.E.2d at 283–84.

181. Defendants Baron, Carpenter, Wise, Lommel, and Buhler were acting under color of law when they violated Dr. Chen's right to free speech by concealing his findings from EPA and terminating his position at MSU.

182. Dr. Chen's speech concerned the validity of safety studies that are used by the EPA to make risk assessments concerning pesticides. Flawed or false pesticide safety studies have a direct impact on public health. Thus, Dr. Chen's speech in making these findings is a matter of public importance and is highly protected. *Pickering v.*, 391 U.S. at 573.

183. Defendants Baron, Carpenter, Wise, Lommel, and Buhler have no sovereign immunity. *Corum*, 413 S.E.2d at 283–84.

184. Defendants Baron, Carpenter, Wise, Lommel, and Buhler's conduct was corrupt, malicious, and outside the scope of their duties, as pled in the paragraphs above. *Doe v. Wake Cnty.*, 826 S.E.2d 815, 819 (2019); *Beck v. City of Durham*, 573 S.E.2d 183, 190 (2002). Therefore, there is no immunity for their acts.

185. Defendants Baron, Carpenter, Wise, Lommel, and Buhler caused Dr. Chen's lost wages, lost retirement, and severe and ongoing emotional distress damages when they violated his Constitutional right to free speech under U.S. Const. amend. I.

186. Defendants Baron, Carpenter, Wise, Lommel, and Buhler are jointly and severally liable for Dr. Chen's actual and nominal damages, punitive damages, and attorney fees caused by their violation of Dr. Chen's Constitutional right to free speech under U.S. Const. amend. I pursuant to 42 U.S.C.§1983.

## <u>COUNT 2 – DUE PROCESS:</u>

**DEFENDANTS BARON, CARPENTER, WISE, LOMMEL, AND BUHLER ARE LIABLE TO DR. CHEN UNDER 42 U.S.C.§1983 FOR VIOLATING HIS U.S. CONST. AMEND. XIV DUE PROCESS RIGHTS.**

187. Plaintiffs repeat the allegations contained in all paragraphs above.

188. The intentional violation of a party's Constitutional rights by a state actor acting under color of law gives rise to an action under 42 U.S.C.§1983.

189. The essential elements for a Fourteenth Amendment procedural due process claim for property deprivation are: (1) a property interest, (2) of which plaintiff was deprived by the defendant, (3) without due process of law, meaning a reasonable notice and the right to be heard. U.S. Const. amend. XIV; *Hatley*, 826 F.Supp.2d at 898. Public employees have a property interest in their employment when there is a promise for continued employment provided under a contract. *Id*.

190. The agreement between IR-4, NCSU and MSU was that Dr. Chen would be employed in an IR-4 NCR QA role by MSU, using the Umbrella Grant funds, up until at least August 2024.

191. Dr. Chen was given no notice or any opportunity to be heard when the decision by the Board was taken to cut funding for his position.

192. Defendants Baron, Carpenter, and Wise worked together to achieve the vote they wanted from Defendant Board in October 2021 to change the original IR-4 / MSU / NCSU agreement that had Dr. Chen in his position at IR-4 NCR until August 2024.

193. Defendants Buhler and Lommel authorized this wrongful interference with Dr. Chen's employment at MSU by authorizing and ratifying the Board vote.

194. Dr. Chen was notified in November 2021, *after* Defendant Board voted to cut his

funding.

195. Dr. Chen was given no opportunity to be heard when the funding was cut.

196. Defendant Baron wanted the funding cut specifically for Dr. Chen.

197. Other IR-4 positions filled that Dr. Chen was qualified for during this same timeframe.

198. Defendants Baron, Carpenter, Wise, Lommel, and Buhler's motive for depriving Dr. Chen of his property interest in employment without due process was wrongful.

199. They were working to prevent Dr. Chen from exercising his First Amendment right to free speech by accurately reporting serious data quality issues with pesticide safety studies.

200. Defendants Baron, Carpenter, Wise, Lommel, and Buhler caused Dr. Chen's lost wages, lost retirement, and severe and ongoing emotional distress damages when they violated his Constitutional right to due process under U.S. Const. amend. XIV.

201. Defendants Baron, Carpenter, Wise, Lommel, and Buhler are jointly and severally liable for Dr. Chen's actual and nominal damages, punitive damages, and attorney fees caused by their violation of Dr. Chen's Constitutional right to due process under U.S. Const. amend. XIV pursuant to 42 U.S.C.§1983.

## COUNT 3 – CIVIL CONSPIRACY:

### DEFENDANTS BARON, CARPENTER, WISE, LOMMEL, AND BUHLER ARE LIABLE TO DR. CHEN UNDER 42 U.S.C.§1985 FOR CONSPIRING TO VIOLATE HIS U.S. CONST. AMEND. I AND XIV RIGHTS AND FOR PREVENTING HIM FROM PERFORMING HIS FEDERALLY MANDATED DUTIES.

202. Plaintiff repeats the allegations in all the paragraphs above.

203. A civil conspiracy claim requires showing: (1) an agreement between two or more

persons to conspire, (2) for the purpose to deprive a person equal protection of the laws, (3) an act in furtherance of the conspiracy, and (4) resulting injury to person or property or deprivation of a constitutional right. 42 USC §1985(3).

204. Conspiracies to prevent federal officers from performing duties is also protected under §1985(1).

205. Defendants Baron, Carpenter, Wise, Lommel, and Buhler agreed to conspire together in furtherance of the goal to silence Dr. Chen, and Dr. Chen was damaged by this wrongful conduct.

206. Defendants Baron, Carpenter, Wise, Lommel, and Buhler each performed many acts to further the conspiracy to silence Dr. Chen, as pled in the paragraphs above.

207. This meets the elements of conspiracy to violate Dr. Chen's right to free speech under U.S. Const. amend. I, for which they are liable. 42 USC §1985(3).

208. Defendants Baron, Carpenter, Wise, Lommel, and Buhler agreed to conspire together in furtherance of the goal to deny Dr. Chen his due process rights when the funding was cut and his position at MSU was terminated.

209. Defendants Baron, Carpenter, Wise, Lommel, and Buhler each took many steps to further their agreement to deny Dr. Chen his due process rights, as pled in the paragraphs above.

210. This meets the elements of conspiracy to violate Dr. Chen's right to due process under U.S. Const. amend. XIV, for which they are liable. 42 USC §1985(3).

211. Defendants Baron, Carpenter, Wise, Lommel, and Buhler agreed to conspire together in furtherance of the goal to prevent Dr. Chen from performing his federally mandated duties to provide true and accurate audits of pesticide safety data, as provided in FIFRA and 40 CFR 160. This meets the elements of civil conspiracy under 42 USC §1985(1).

212. Defendants Baron, Carpenter, Wise, Lommel, and Buhler are jointly and severally liable for Dr. Chen's actual and nominal damages, punitive damages, and attorney fees caused by their civil conspiracy pursuant to 42 U.S.C.§1985.

**WHEREFORE**, Plaintiff seeks recovery for damages from Defendants, either as individuals or in their official capacities as this Court deems fit. Plaintiff respectfully requests judgment against the Defendants as follows:

(a) Declare that Defendants Baron, Carpenter, Wise, Lommel, and Buhler are jointly and severally liable for damages to Plaintiff under 42 U.S.C.§1983 for violating his rights to freedom of speech under U.S. Const. amend. I, and due process under U.S. Const. amend XIV.

(b) Declare that Defendants Baron, Carpenter, Wise, Lommel, and Buhler are jointly and severally liable for damages to Plaintiff for civil conspiracies under 42 U.S.C.§1985.

(c) Awarding Plaintiffs punitive and reasonable attorneys' fees pursuant to 42 U.S.C.§1983; 42 U.S.C.§1985; and North Carolina common law.

(d) Awarding Plaintiffs such other and further relief as the Court deems just and proper.

Respectfully submitted on this 23rd day of October 2025.

By: *<u>/s/ Sandra Daussin</u>*
Sandra Daussin
NC Bar No. 56465
AVA Law Group, PC
52 Somerleigh Way
Pittsboro, NC 27312
Telephone (406) 500-3245

Fax (406) 794-0418
Email: *sandra.daussin@avalaw.com*

By: *<u>/s/ Andrew Van Arsdale</u>*
Andrew Van Arsdale
CA Bar No. 323370 *(pro hac vice* forthcoming)
AVA Law Group, PLLC
3667 Voltaire Street, Ste. 101
San Diego, CA 92106
Telephone (800) 777-4141

By: *<u>/s/ Eric Peterson</u>*
Eric Peterson
MT Bar No. 11587 *(pro hac vice* forthcoming)
AVA Law Group, Inc.
2718 Montana Ave #220
Billings, MT 59101
Telephone (406) 626-3976

*Attorney for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No.__:_______-CV-____ - ____

| | | |
|---|---|---|
| ZHONGXIAO MICHAEL CHEN, PH.D.<br><br>Plaintiff,<br><br>v. -<br><br>JERRY BARON, PH.D, individually and in his official capacities as IR-4 Executive Director and as a NCSU employee; DEBORAH CARPENTER, PH.D., individually and in her official capacities as IR-4 Associate Director and a NCSU employee; JOHN WISE, PH.D., individually and in his official capacities as IR-4 Board Chair, IR-4 North Central Region Director, a MSU employee, and an agent of NCSU; STEVEN LOMMEL, PH.D., individually and in his official capacities as the IR-4 Headquarters Administrative Advisor and a NCSU employee; DOUGLAS BUHLER, PH.D., individually and in his official capacities as the IR-4 North Central Regional Administrative Advisor, a MSU employee, and an agent of NCSU; and DEFENDANT DOES 6 THROUGH 10<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | AFFIDAVIT OF COUNSEL REGARDING COMPLAINT |

The undersigned, Sandra Daussin, submits this Affidavit in the above-referenced matter stating that:

1. I am over the age of eighteen, not under any disability, and am fully competent to make this affidavit.

2. I am an attorney with the law firm AVA Law Group and am licensed to practice law in the State of North Carolina.

3. Before practicing law, I worked as a regulatory scientist chemist.

4. I have 20+ years' work experience with pesticide safety studies.

5. I have reviewed the voluminous evidence from the FOIA Documents, other publicly available sources, and from Dr. Chen, including the technical scientific information specific to pesticide safety studies.

6. To the best of my knowledge, all of the allegations in this Complaint are substantiated by the documented evidence or are reasonable inferences from the same.

Dated this 22 day of October, 2025.

Sandra Tracy Daussin

Sandra Daussin
NC Bar No. 56465
AVA Law Group, PC
52 Somerleigh Way
Pittsboro, NC 27312
Telephone (406) 500-3245
Fax (406) 794-0418
Email: *sandra.daussin@avalaw.com*

Sworn to and subscribed before me this 22nd day of October, 2025.
Notary Public
Signature:
Printed Name: Seth Riggs
Commission Expires on: 02/11/2029
Florida Bay County

(Official Seal)

NOTARY PUBLIC • STATE OF FLORIDA •
SETH RIGGS
Notary Public - State of Florida
Commission # HH639513
Expires on February 11, 2029

Notarized remotely online using communication technology via Proof.

Proof

# How to Verify This Transaction

Every Proof transaction is recorded and saved for a minimum of five years. Whether you receive an electronic or printed paper copy of a Proof document, you can access details of the transaction and verify its authenticity with the information below.

To get started, visit **verify.proof.com** and enter this information:

| | |
|---|---|
| **Access ID:** | YC88F329 |
| **Access PIN:** | 3XR6Z6 |

For more information on how to verify Proof transactions, please visit: **support.proof.com**

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No.__:_______-CV-____ - ____

| | | |
|---|---|---|
| ZHONGXIAO MICHAEL CHEN, PH.D.<br><br>Plaintiff,<br><br>v. -<br><br>JERRY BARON, PH.D, individually and in his official capacities as IR-4 Executive Director and as a NCSU employee; DEBORAH CARPENTER, PH.D., individually and in her official capacities as IR-4 Associate Director and a NCSU employee; JOHN WISE, PH.D., individually and in his official capacities as IR-4 Board Chair, IR-4 North Central Region Director, a MSU employee, and an agent of NCSU; STEVEN LOMMEL, PH.D., individually and in his official capacities as the IR-4 Headquarters Administrative Advisor and a NCSU employee; DOUGLAS BUHLER, PH.D., individually and in his official capacities as the IR-4 North Central Regional Administrative Advisor, a MSU employee, and an agent of NCSU; and DEFENDANT DOES 6 THROUGH 10<br>Defendants. | ) | AFFIDAVIT OF PLAINTIFF REGARDING COMPLAINT |

I, Zhongxiao Michael Chen, Ph.D., being duly sworn, depose and say:

1. I am over the age of eighteen, not under any disability, and am fully competent to make this affidavit.

2. I have personal knowledge of the facts set forth herein.

3. All of the allegations in this Complaint are true and accurate to the best of my knowledge.

Dated this 17th day of October, 2025.

Zhongxiao Michael Chen

Zhongxiao Michael Chen, Ph.D.

Sworn to and subscribed before me this 17th day of October, 2025.
Notary Public
Signature:
Printed Name: Merryessa Johnese Notary Public, State of Texas
Commission Expires on: 04/24/2029

(Official Seal)

NOTARY PUBLIC STATE OF TEXAS

Merryessa Johnese

ID NUMBER
135512375
COMMISSION EXPIRES
April 24, 2029

Electronically signed and notarized online using the Proof platform.

Proof

# How to Verify This Transaction

Every Proof transaction is recorded and saved for a minimum of five years. Whether you receive an electronic or printed paper copy of a Proof document, you can access details of the transaction and verify its authenticity with the information below.

To get started, visit **verify.proof.com** and enter this information:

| | |
|---|---|
| **Access ID:** | J92U5GQ6 |
| **Access PIN:** | UHPNBF |

For more information on how to verify Proof transactions, please visit: **support.proof.com**

# EXHIBIT 1

**Appendix 8**

**Memorandum of Agreement to relocate IR-4 Project Headquarters from Rutgers University to North Carolina State University**

STATE OF NORTH CAROLINA

WAKE COUNTY

## MEMORANDUM OF AGREEMENT

This Memorandum of Agreement ("Agreement"), effective as the first day of October 2019 ("Effective Date") is made by and between **NORTH CAROLINA STATE UNIVERSITY** ("**NC State**"), on behalf of its College of Agriculture and Life Sciences ("**CALS**") the Minor Crop Pest Management Program Interregional Research Project Number 4 ("**IR-4 Project**"), and Rutgers, The State University of New Jersey on behalf of its New Jersey Agricultural Experiment Station("**Rutgers**"). NC State, IR-4 Project, and Rutgers may be referenced collectively in this Agreement as the "Parties" or each individually as a "Party."

## RECITALS

The IR-4 Project has been the primary resource for facilitating registrations of conventional chemical pesticides and biopesticides for specialty crops and other minor uses (specialty uses) in the United States. Using its unique ability to partner with government, industry and growers, IR-4 develops required data to support the registration of pest management products.

The IR-4 Project operates as a unique partnership between the Federal government (USDA, EPA, etc.), the land-grant universities/State Agricultural Experiment Stations (SAES), farmers/commodity associations, food processors, the crop protection/pest management industry and international partners (e.g. Pest Management Centre of Agriculture and Agri-Food Canada). The IR-4 Project Headquarters is currently hosted by Rutgers.

NC State is a public, land-grant university and a constituent institution of the University of North Carolina System. In collaboration with the USDA, NC State administers the Cooperative Extension program for the State of North Carolina. In addition, NC State currently operates an IR-4 Project Field Research Center.

The Parties desire to enter into this Agreement whereby Rutgers shall transition the IR-4 Project Headquarters ("Headquarters") from Rutgers to NC State. In doing so, Rutgers shall transfer certain assets to NC State, including but not limited to certain contracts, grants, and/or intellectual property associated with the IR-4 Project.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## I. TERM

1. **Term of the Agreement.** This Agreement shall commence on October 1, 2019 and continue for a period of ten (10) years until September 30, 2029 (the "Term"), unless otherwise terminated as provided herein. No later than by March 30, 2028, NC State, IR-4, and the USDA shall negotiate exclusively with each other to arrive at mutually agreeable terms for the extension of NC State hosting the Headquarters. Notwithstanding anything else in this MOA, Rutgers responsibility for oversight of the IR-4 Project shall decrease as transfer of assets and responsibilities move to NC State and shall be completely terminated upon the end of the Transition Period.

2. **Transition Period.** Because of the need for the Headquarters to remain fully functional at all times during and after the transition, the first two (2) years of the Agreement will be considered a transition period to strategically move operations in a coherent manner ("Transition Period"). Throughout the Transition Period, Rutgers, in cooperation with NC State shall be transferring assets and responsibilities to NC State on a rolling basis, timing of such transfers being determined by the needs of the IR-4 Project (e.g. grants that are being renewed will be transferred on renewal; as Rutgers personnel administering the IR-4 Project wind down their responsibilities and/or retire or leave, their responsibilities shall be transferred to NC State.)

## II. NC STATE HOSTING IR-4 PROJECT HEADQUARTERS

1. **Oversight and Administrative Support.**
   a. *Transition Period.* Rutgers will initially maintain administrative and programmatic oversight of the Headquarters during the Transition Period. This oversight includes: human resources administration, including employee management, payroll and benefits processing; purchasing and procurement; as well as grant management and establishing subawards with NC State for transitioning of the Headquarters to NC State. The Parties intend that near the end of the Transition Period, the Headquarters will formally move to NC State. Upon the transfer and the move of the Headquarters to NC State, NC State will assume all administrative and programmatic oversight as indicated below.
   b. *Remainder of the Term.* NC State shall have institutional administrative and programmatic oversight of the Headquarters after the Transition Period. The Headquarters will be subject to applicable state and federal laws, and NC State policies. The NC State oversight and administration of the Headquarters will include, at a minimum:
      i. Grant management, including submission of grant applications, receipt of grants, establishing subawards, audit, compliance, and fiscal reporting;
      ii. Purchasing and procurement;
      iii. Human Resources, including hiring, discipline, payroll, benefits administration, etc.;
      iv. Payroll processing, including travel reimbursement; and
      v. Other administrative functions as necessary and/or required.

2. **Office Space.** IR-4 Project is responsible for securing and obtaining office space for the Headquarters, preferably on NC State's campus or at NC State's owned or leased properties, during the Term. IR-4 Project will be responsible for all Headquarters' rental or lease costs. NC State will provide limited, temporary office space at its discretion to IR-4 Project during the Transition Period ("temporary space"). IR-4 Project will be responsible for the costs and expenses for any required additional space beyond the temporary space during the Transitional Period. IR-4 will be responsible for the costs and expenses of any upfit for the more permanent Headquarters space. IR-4 Project shall continue to be responsible for any costs and expenses for space related to Rutgers' administrative responsibilities for the IR-4 Project.

3. **IR-4 Project Personnel.**

   a. *Existing Employees.*

      i. Science-based team members: Subject to applicable NC State policies and upon review of job descriptions, NC State will attempt to create comparable NC State EHRA non-faculty employee positions at equitable salary levels for science-based team members who currently have advanced degrees (Masters or Ph.D.). These employees' benefit packages will be the standard package offered to NC State EHRA non-faculty employees. Science-based team members must meet all applicable requirements for employment at NC State.

      ii. Executive and Senior Management positions: Subject to applicable NC State policies and upon review of job descriptions, NC State will attempt to create comparable EHRA non-faculty employee positions at equitable salary levels for senior leaders and managers that satisfy requirements of EHRA non-faculty classifications. These employees' benefit packages will be the standard package offered to NC State non-faculty employees. These senior leaders and managers must meet all applicable requirements for employment at NC State.

      iii. Mission critical employees: NC State may consider for employment a small number of mission critical employees who are approved to perform their job duties and responsibilities from a remote work location pursuant to a telework agreement that shall include, but not be limited to, provisions for appropriate oversight and accountability. Consideration for employment and any telework performed outside of Raleigh for NC State employees would begin upon full transition to and hosting of the Headquarters at NC State. Prior to this transition event, these employees would remain Rutgers employees.

      iv. Administrative support staff: IR-4 Project administrative support staff employed as of the commencement date of this Agreement are not guaranteed, nor will they be automatically offered, employment opportunities at NC State. However, these employees may submit applications for employment at NC State for available positions within the Headquarters.

      v. Rutgers is responsible for any and all costs associated with separations of existing IR-4 employees employed by Rutgers. However, to

the extent that Rutgers personnel continue to administer the IR-4 Project during the Transition Period, cost for this personnel shall be borne by the IR-4 Project to the extent the IR-4 Project is currently responsible for these costs.

b. *Future Employees.* All IR-4 Project employees hired after the commencement date of this Agreement must be hired pursuant to all applicable NC State hiring policies and practices.

c. *University Policies and Procedures.* As a condition of employment at NC State, all IR-4 Project Headquarters employees will be subject to all University policies, regulations and rules.

d. *Adjunct Faculty Status.* The IR-4 Project may recommend certain employees for appointment as adjunct faculty at NC State pursuant to section 4.3 of NCSU REG 05.20.34 (Non-Tenure Track Faculty Ranks and Appointments).

## III. FINANCIAL SUPPORT

1. **Transition Period.** During the Transition Period, Rutgers will transfer certain grant funding to NC State, either by transferring the grants as they come up for renewal or through sub-awards for IR-4 Project operations and work for transitioning the Headquarters to NC State. There are also certain funds in a gift account that will be transferred from Rutgers to NC State.

2. **Operational Costs.** While hosted by NC State, the Headquarters is expected to pay for its operational costs, (including but not limited to personnel salaries, employee fringe benefits, office space costs, travel, materials, supplies, equipment, IT support, and other direct expenses) through federal grants and corporate donations. The Parties intend for the Headquarters to be self-sustaining and that NC State will not incur financial obligations or costs for hosting and providing administration for the Headquarters. Rutgers shall not incur any additional financial obligations or costs for its continued role in administering the IR-4 Project or administrative or personnel costs incurred related to the IR-4 Project during the Transition Period.

3. **IR-4 Project Contribution.**

a. *Annual Contribution.* Each year, IR-4 Project must contribute, pay, or transfer to NC State 10% of the annual total expenditures for the Headquarters' operation (the "Annual Contribution"). The Annual Contribution may be paid from a combination of any indirect costs collected, institutional charges on corporate donations, and if necessary, a direct contribution of supplemental cash. Starting October 1, 2026, the amount of the Annual Contribution will increase by one-percentage point per year until the end of this Agreement.

b. *Minimum Contribution.* If at the end of NC State's fiscal year, the amount of funds returned unencumbered to CALS (i.e. net of any institutional charges or overhead not returned to CALS) from IR-4 Project

contributions ("returned funds") are less than $55,000.00 ("threshold amount"), CALS will invoice IR-4 Project the difference between the threshold amount and the returned funds for payment.

4. **Cooperation.** It is expected that NC State and IR-4 Project will work collaboratively to develop ways to lessen the fiscal burden of the Headquarters on NC State.

## IV. TRANSFER OF ASSETS

1. **Transfer.** Subject to the terms and conditions provided in this Agreement, Rutgers shall contribute, transfer, assign, convey and deliver to NC State, and NC State shall acquire and accept from Rutgers, all of Rutgers' right, title and interest in, to and under the assets associated with the Headquarters as the components of the IR-4 Project are transferred to NC State. Such assets shall include, but not be limited to, any grants or other contracts related to the Headquarters.

2. **Transfer Costs.** IR-4 Project and Rutgers shall be responsible for coordinating and payment of all costs associated with shipment and/or delivery of any assets associated with the Headquarters.

3. **Operation of Website.** Following the Transition Period, the existing IR-4 Project website shall be updated to reflect the new NC State contact information for the Headquarters. IR-4 Project shall maintain the current IR-4 Project website ("https://www.ir4project.org/") and all underlying data, applications, technical support services, and any other processes associated with operation of the website following execution of this Agreement until such time as the Parties desire to move IR-Project to a NC State domain or server. In the event that the Parties mutually agree that updates or changes are required to be made for the current website after the execution of this Agreement, the Parties agree to coordinate and cooperate in order to make such updates. In the event there is any electronic file, code, image, or other media associated with the current website that must be incorporated into a new website, the Parties agree to coordinate to copy and/or transfer the identified material.

4. **Further Assurances.** The Parties agree to execute any and all documents and instruments of transfer, assignment, assumption or novation and to perform such other acts as may be reasonably necessary or expedient to further the purposes of this Agreement and the transactions contemplated by this Agreement.

## V. REPRESENTATIONS AND WARRANTIES

1. **By Rutgers.** Rutgers is a public institution of higher education established under the laws of the State of New Jersey. Rutgers has all requisite power and authority to execute and deliver this Agreement, to carry out its obligations hereunder, and to consummate the transactions contemplated hereby. Rutgers has obtained all

necessary institutional and governmental approvals for the execution and delivery of this Agreement, the performance of its obligations hereunder, and the consummation of the transactions contemplated hereby.

2. **By NC State.** NC State is a public institution of higher education established under the laws of the State of North Carolina. NC State has all requisite power and authority to execute and deliver this Agreement, to carry out its obligations hereunder, and to consummate the transactions contemplated hereby. NC State has obtained all necessary institutional approvals for the execution and delivery of this Agreement, the performance of its obligations hereunder, and the consummation of the transactions contemplated hereby.

3. **By IR-4 Project.** The IR-4 Project is a public entity supported by funds and resources from the USDA. The IR-4 Project has all requisite power and authority to execute and deliver this Agreement, to carry out its obligations hereunder, and to consummate the transactions contemplated hereby. The IR-4 Project has obtained all necessary corporate, institutional, and governmental approvals for the execution and delivery of this Agreement, the performance of its obligations hereunder, and the consummation of the transactions contemplated hereby.

## VI. COORDINATION AND COMMUNICATIONS

1. **Transition Period.** The Parties recognize the importance of effectively coordinating and managing communications regarding the Headquarters during the Transition Period. The Parties shall work closely together to communicate about and coordinate the timeline for an orderly transfer of assets and responsibilities to NC State to minimize disruption to the IR-4 Project. In separate agreement, Rutgers and NC State shall cooperate to create a detailed transfer plan and timeline to ensure that the transfer of all assets and responsibilities for the IR-4 Project are completed by the end of the Transition Period.

2. **Throughout the Term.** NC State and the IR-4 Project shall endeavor to promote and advertise the existence of the Headquarters at NC State, including use of the other Parties' marks and logos with permission, through relevant media, print, trade shows, special events, the internet, and other commercially reasonable efforts to further the interests of the Parties. A Party shall obtain the other Parties' prior approval of all print or media promotions or advertisements prior to use. Subject to the terms and conditions of this Agreement, the Parties hereby grant to each other a nonexclusive, nontransferable license to use the Parties' marks and logos for the sole purpose of the Parties obligations under this paragraph, and no other. The Parties shall use reasonable due diligence in safeguarding the interests of the other Party and shall keep the other Party reasonably informed of its activities as well as market conditions.

## VII. INTELLECTUAL PROPERTY

It is recognized and understood that certain existing materials, data, information, and technologies are the separate property of Rutgers, the IR-4 Project, or NC State, and are not affected by this Agreement, and neither party shall gain any rights in such separate materials and technologies.

## VIII. TERMINATION

During the Transition Period, a Party may terminate this Agreement only in the event one or more Parties commits a material breach of this Agreement that is not cured within thirty (30) days of written notice from the non-breaching Party(ies). Following the Transition Period, from the beginning of years three (3) through (7) of this Agreement (October 1, 2021 –Sept. 30, 2026) NC State or the IR-4 Project may terminate this Agreement only in the event the other Party commits a material breach of this Agreement that is not cured within thirty (30) days of written notice from the non-breaching Party. Beginning October 1, 2026, NC State or the IR-4 Project may terminate this Agreement by giving twelve (12) months written notice to the other Party. For purposes of clarification, failure to comply with and meet the obligations for Financial Support of the Headquarters, as provided in Section III, will constitute a material breach of this Agreement

## IX. LIABILITY AND INDEMNIFICATION

1. **Liability.** Subject to the provisions of paragraph 2 of this Section IX, the Parties shall be responsible for their own performance of this Agreement. It is understood that none of the Parties to this Agreement is the agent of any other and none is liable for the wrongful acts or negligence of the others. Each Party shall be responsible for its negligent acts or willful misconduct and those of its officers, employees, and agents howsoever caused, to the extent allowed by laws. NC State's liability and indemnification, including for bodily injury, property damage or any other matter sounding in tort will be determined in accordance with the provisions, procedures, and limits of the North Carolina Tort Claims Act, N.C.G.S. § 143-291, et seq., and NC State's assertion of sovereign immunity.

2. **Indemnification.**

   a. *Indemnification by NC State.* NC State shall indemnify and hold harmless Rutgers from and against any damages, losses, liabilities, fines, penalties, costs and expenses ("Losses") incurred by Rutgers to the extent resulting from (i) any breach of any representation or warranty made by NC State in this Agreement; (ii) any breach of or failure by NC State to perform any agreement or obligation contained in this Agreement; (iii) any liabilities or obligations incurred directly attributable to NC State's oversight and hosting of the Headquarters after the execution of this Agreement (including during the Transition Period).

   b. *Indemnification by Rutgers.* Rutgers shall indemnify and hold harmless NC State from and against any Losses incurred by NC State to

the extent resulting from (i) any breach of any representation or warranty made by Rutgers in this Agreement; (ii) any breach of or failure by Rutgers to perform any covenant, agreement or obligation contained in this Agreement; and (iii) any liabilities or obligations incurred in connection with Rutgers responsibilities for the oversight and administration of the the IR-4 Project prior to the execution of this Agreement and during the Transition Period. For the avoidance of doubt, Rutgers is only responsible for its own actions and as assets and programmatic and administrative responsibilities are transferred to NC State they shall become the sole responsibility of NC State. Rutgers hereby releases, acquits and forever discharges NC State, its trustees, officers, employees, and agents assigns from any and all demands, claims, causes of action and/or judgments arising directly attributable to Rutgers' oversight, management, operation, and hosting of the Headquarters prior to execution of this Agreement.

## X. CONFIDENTIALITY

The Parties will treat any confidential information disclosed to it by the another Party, and marked "Confidential", with reasonable care and will not disclose such information to any other person, firm or corporation, unless such third party is bound by the obligations of confidentiality and restricted use set forth in this paragraph. The receiving Party may not use the disclosing Party's confidential information other than for the benefit of the Parties hereto and for the performance of this Agreement. These obligations of non-disclosure and restricted use remain in effect for each subject disclosure of confidential information for three (3) years from the date of disclosure. However, no Party is obligated, with respect to confidential information disclosed to it, or any part thereof, which: (a) is already known to the receiving Party at the time of the disclosure; (b) becomes publicly known without the wrongful act or breach of this Agreement by the receiving Party; (c) is rightfully received by the receiving Party from a third party on a non-confidential basis; (d) is subsequently and independently developed by employees of the receiving Party who had no knowledge of the information, as verified by written records; (e) is approved for release by prior written authorization of the disclosing Party; or (f) is disclosed pursuant to the requirements of applicable law or pursuant to any judicial or government requirement or order, provided that the Party so disclosing takes reasonable steps to provide the other Party sufficient prior notice in order to contest such request, requirement or order.

## XI. GENERAL PROVISIONS

1. **Assignment.** The Parties shall not assign this Agreement or any privileges granted hereunder without the prior written mutual consent of the Parties.

2. **Marks and Logos.** The Parties shall not use the logos, marks, or names of the any other Party, or imply a Party's endorsement or support, without the prior written approval of the Parties' authorized officials. Once the Headquarters is

hosted by NC State, it is expected that the IR-4 Project will begin to use NC State's logos, marks, and names. However, all such uses must still be approved by NC State.

3. **Notices.** All notices shall be hand delivered, sent by private overnight mail service, or sent by registered or certified U.S. mail and addressed to the party to receive such notice at the address given below, or such other address as may hereafter be designated by notice in writing:

If to NC State:
North Carolina State University
Campus Box 7602
Raleigh, NC 27695-7602

If to Rutgers:
Rutgers, The State University of New Jersey
33 Knightsbridge Rd,
2nd Flr East
Piscataway, NJ 08854-3925
Attn: Diane Ambrose, Ph.D.
Director, Research and Sponsored Programs

If to IR-4 Project:
Executive Director
500 College Road East
Suite 201 W
Princeton, NJ 08540

4. **Force Majeure.** Neither Party shall be deemed to be in default of its obligations hereunder if and so long as it is prevented from performing such obligations by an act of war, hostile foreign action, nuclear explosion, earthquake, hurricane, tornado, or other catastrophic natural event or act of God.

5. **Entire Agreement.** This Agreement contains the entire agreement of the parties and there are no representations, inducements or other provisions other than those expressed herein. All changes, additions or deletions to this Agreement shall be in writing and executed by the authorized representatives of both parties.

6. **Severability.** Should any provision of this Agreement be declared illegal, void, or unenforceable under law, or shall be considered severable, the Agreement shall remain in force and be binding upon the parties hereto as though the said provision had never been included.

7. **Counterparts.** This Agreement may be executed in one or more counterparts, each of which will constitute an original, but all of which together will constitute one instrument.

**IN WITNESS THEREOF,** the parties have executed this Agreement in duplicate originals, one of which is retained by each of the parties, effective the date of the last signature below.

**NC STATE UNIVERSITY**

Name: Charles Maimone
Title: Vice Chancellor for Finance and Administration
Date: 10/21/19

**IR-4 PROJECT**

Name: Jerry Baron
Title: Executive Director IR-4 Project
Date: ______________________

**RUTGERS, THE STATE UNIVERSITY OF NEW JERSEY**

Name: Diane Ambrose, Ph.D.
Title: Director, Research and Sponsored Programs
Date: ______________________

**Acknowledged By:**

For RHL

Name: Richard Linton
Title: Dean, College of Agriculture and Life Sciences
Date: 10/7/19

Name: A. Richard Bonanno
Title: Associate Dean and Director NC State Extension
Date: 10/7/2019

Name: Steven A. Lommel
Title: Associate Dean for Research, College of Agriculture and Life Sciences, and Director North Carolina Agricultural Research Service
Date: 10/7/19

**IN WITNESS THEREOF,** the parties have executed this Agreement in duplicate originals, one of which is retained by each of the parties, effective the date of the last signature below.

**NC STATE UNIVERSITY**

Name: Charles Maimone
Title: Vice Chancellor for Finance and Administration
Date: ______________________

**IR-4 PROJECT**

Name: Jerry Baron
Title: Director – IR-4
Date: 22 Oct 2019

**RUTGERS, THE STATE UNIVERSITY OF NEW JERSEY**

Name: Diane Ambrose, Ph.D.
Title: Director, Research and Sponsored Programs
Date: 10/9/19

**Acknowledged By:**

Name: Richard Linton
Title: Dean, College of Agriculture and Life Sciences
Date: ______________________

Name: Steven A. Lommel
Title: Associate Dean for Research, College of Agriculture and Life Sciences, and Director North Carolina Agricultural Research Service
Date: ______________________

Name: A. Richard Bonanno
Title: Associate Dean and Director NC State Extension
Date: ______________________

# Zhongxiao Michael Chen, Ph.D.

IR-4 North Central Region Research Center
Michigan State University
3900 Collins Road, Suite 1031B (shipping)
3815 Technology Blvd, Suite 1031B (mailing)
Lansing, MI 48910-8396
Phone: 517-336-4673 Fax: 517-432-2098
E-mail: chenzho@msu.edu

## EDUCATION:

Ph. D. — University of Florida, Major in Entomology and Plant Nematology, December 1996. Dissertation title "Biological control potential of *Pasteuria penetrans.*"

M. S. — Zhejiang Agriculture University, Major in Entomology, July 1986. Thesis title "Fate of herbicide butachlor in paddy rice fields: Studies on leaching, persistence, and bio-degradation."

B. S. — Zhejiang Agriculture University, Major in Crop Protection, July 1983.

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2009-present | Sr. Academic Specialist/IR-4 Regional QA Coordinator, Michigan State Univ. |
| 2000-2009 | Academic Specialist/IR-4 Regional QA Coordinator, Michigan State University. |
| 1998-2000 | Research Director, Pest Pros, Inc., Plainfield, Wisconsin. |
| 1996-1998 | Postdoctoral Research Associate, University of Florida. |
| 1994-1996 | Graduate Research Associate, University of Florida. |
| 1986-1994 | Research Assistant Professor, China National Rice Research Institute, Zhejiang. |

## SUMMARY OF SCHOLARLY ACTIVITIES

Over 30 years of experience in entomology, nematology, nematode biological control, integrated pest management, minor crop pesticide registration, and pesticide ecotoxicology. Since May 2000, employed as the IR-4 North Central Region Quality Assurance Director at Michigan State University, adjunct faculty at the National Food Safety and Toxicology Center and Department of Entomology. Applied the EPA Good Laboratory Practice standards (40 CFR 160.35) to inspect and audit IR4 studies for regulatory compliance. My work contributed to numerous pesticide clearances and registrations on minor crops and assured the compliance of GLP studies with over 34 successful EPA inspections. Produced/responsible for over 3,527 quality assurance reports up to date and presented at over 90 professional/trade meetings. Invited speaker for over 36 presentations, including international workshops in China, Indonesia, Kenya, and Thailand. Awarded the 1st Place in Best Graduate Student Paper from the Society of Nematologists in 1997 and 2nd Place in Best Graduate Student Paper from the Soil and Crop Science Society of Florida in 1997, plus others. Published 2 books, 3 book chapters, and 45 refereed papers.

## AWARDS AND HONORS

IR-4 North Central Region Meritorious Award, 2018

Gamma Sigma Delta
Plaque and Award, Best Graduate Student Paper, Society of Nematologists, 1997
Plaque and Award, Best Graduate Student Paper, Soil and Crop Science Society of Florida, 1997
Awards of Science and Technology Progress, The Chinese Ministry of Agriculture, 1991
Plaque and Awards, "Bumper Harvest," The Chinese Ministry of Agriculture, 1989 and 1990

**PROFESSIONAL SOCIETY MEMBERSHIP**
Society of Quality Assurance (2000 – 2016)
Society of Nematologists

**SELECT PUBLICATIONS (> 50 REFEREED PAPERS)**

Chen, Z. X., S. Y. Chen, and D. W. Dickson, eds. 2004. Nematology – Advances and perspectives. Volume I. Nematode morphology, physiology, and ecology. Pp. 1 – 636. CABI Publishing and Tsinghua University Press.

Chen, Z. X., S. Y. Chen, and D. W. Dickson, eds. 2004. Nematology – Advances and perspectives. Volume II. Nematode management and utilization. Pp. 637 – 1234. CABI Publishing and Tsinghua University Press.

Chen, Z. X., and D. W. Dickson. 2004. Biological control with bacterial antagonists. Pp. 1041-1082 in Z. X. Chen, S. Y. Chen, and D. W. Dickson, eds. Nematology – Advances and Perspectives. Vol. II. Nematode management and utilization. CABI Publishing and Tsinghua University Press.

Sotomayor, D., L. H. Allen, Jr., Z. X. Chen, D. W. Dickson, and T. E. Hewlett. 1999. Anaerobic soil management practices and solarization for nematode control in Florida. Nematropica 29:153-170.

Chen, Z. X., and D. W. Dickson. 1998. A review on *Pasteuria penetrans:* Biology, ecology, and biological control potential. Journal of Nematology 30:313-340.

Chen, Z. X., D. W. Dickson, L. Freitas, and J. F. Preston. 1997. Ultrastructure, morphology, and sporogenesis of *Pasteuria penetrans*. Phytopathology 87:273-283.

Chen, Z. X., D. W. Dickson, D. J. Mitchell, R. McSorley, and T. E. Hewlett. 1997. Suppression mechanisms of *Meloidogyne arenaria* race 1 using *Pasteuria penetrans*. Journal of Nematology 29:1-8.

Chen, Z. X., and D. W. Dickson. 1997. Estimating incidence of attachment of *Pasteuria penetrans* endospores to *Meloidogyne* spp. with tally thresholds. Journal of Nematology 29:289-295.

Chen, Z. X., and D. W. Dickson. 1997. Minimal developmental temperature of *Pasteuria penetrans*. Journal of Nematology 29:635-644.

Chen, Z. X., and D. W. Dickson. 1997. Effects of ammonium nitrate and time of harvest on mass production of *Pasteuria penetrans*. Nematropica 27:55-60.

Chen, Z. X., D. W. Dickson, R. McSorley, D. J. Mitchell, and T. E. Hewlett. 1996. Suppression of *Meloidogyne arenaria* race 1 by soil application of endospores of *Pasteuria penetrans*. Journal of Nematology 28:169-178.

Chen, Z. X., and G. W. Hu. 1992. Effect of neem-origin insecticide on the ecological and physiological aspects of insects. Kunchong Zhishi (Insect Knowledge) 29:314-317.

Chen, Z. X., and D. F. Fan. 1988. Leaching, persistence, and degradation of herbicide butachlor in soils. Environmental Chemistry 7(2):30-36.

Chen, Z. X. 1986. Residue analysis of herbicide butachlor by gas chromatography. Environmental Chemistry 5(6):1-5.

Zhongxiao Michael Chen

UNITED STATES DEPARTMENT OF AGRICULTURE
COOPERATIVE STATE RESEARCH, EDUCATION, AND EXTENSION SERVICE

OMB Approved 0524-0039
Expires 03/31/2004

# CURRENT AND PENDING SUPPORT

**Instructions:**

1. Record information for active and pending projects, including this proposal. (Concurrent submission of a proposal to other organizations will not prejudice its review by CSREES.)
2. All current efforts to which project director(s) and other senior personnel have committed a portion of their time must be listed, whether or not salary for the person involved is included in the budgets of the various projects.
3. Provide analogous information for all proposed work which is being considered by, or which will be submitted in the near future to, other possible sponsors including other USDA programs.

| NAME (List/PD #1 first) | SUPPORTING AGENCY AND AGENCY ACTIVE AWARD/PENDING PROPOSAL NUMBER | TOTAL $ AMOUNT | EFFECTIVE AND EXPIRATION DATES | % OF TIME COMMITTED | TITLE OF PROJECT |
|---|---|---|---|---|---|
| | **Current:** | | | | |
| Wise, VanWoerkom, Chen, Erhardt, Jiang | USDA - NIFA | $ 3,874,701 | 8/16/19 – 8/15//21 | 100 | Interregional Research Project #4 Minor Crop Pest Management Program for the North Central Region |
| | **Pending:** | | | | |
| Baron et al. Wise, VanWoerkom, Chen, Erhardt, Jiang | USDA - NIFA | $56,070,513 | 8/16/19 – 8/15//24 | 100 | Interregional Research Project #4 Minor Crop Pest Management Program for the North Central Region |

According to the Paperwork Reduction Act of 1995, an agency may not conduct or sponsor, and a person is not required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0524-0039. The time required to complete this information collection is estimated to average 1.00 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

Form CSREES-2005 (12/2000)

## EXHIBIT 2

Ms. Latham's audit and the GLP Compliance Statement are provided to illustrate IR-4's pattern of disregard for GLP compliance.

The identifying information for the pesticide and crop has been redacted, as this information is not relevant to Dr. Chen's claims.

## GLP COMPLIANCE STATEMENT

This study, as indicated by responsible individuals, meets current Good Laboratory Practice Requirements of 40 CFR Part 160, except as noted below. Some of the characterizations of the test and reference substances were performed at the test facility in Münchwilen, Switzerland, which is recognized under the Mutual Acceptance of Data Program. Additionally, some Canadian trials were conducted at a test site under OECD GLP Principles. Under an OECD Council Decision on the Mutual Acceptance of Data (MAD), test data generated in any member country in accordance with OECD Test Guidelines and Principles of Good Laboratory Practice (GLP) shall be accepted in other member countries for assessment purposes and other uses relating to the protection of human health and the environment. These deviations do not affect the conclusions presented in this report.

**GLP deviation declarations:**

1. Supporting data such as weather / irrigation, soil characterization records; test site history and cultural practices; and maintenance fertilizers and pesticides data were not collected in strict adherence to 40 CFR 160 guidelines for all trials.
2. At the [redacted] field trials, global positioning devices used to determine plot location in the field trials were not maintained according to GLP guidelines.
3. At the [redacted] field trials, the pH meter/strips used to measure the acidity of the carrier in the field trials were not maintained according to GLP guidelines.
4. At the [redacted] field trials, residue sample weighing equipment in the field trials were not maintained according to GLP guidelines.
5. At trial [redacted] air humidity measurements at application and use of an adjuvant at application, receipt and storage was not maintained according to GLP guidelines.

Submitter
and Study Director (IR-4) [redacted]

Sponsor (IR-4): _______________ DATE: [redacted] 2016
Testing Facility Management
IR-4 Project

[redacted]

[redacted]

ARDA (Analytical Raw Data Audit)

[redacted]

[redacted]

[redacted]

Hi Sue,

Please read the following findings.  Place your response after the finding and initial and date each of your responses.

To save your entered responses, please remember to "submit" (click the submit icon to close the text editor) and then "Save" (on next screen, to save your entries).

ATTACH all corrected pages, new pages, etc. to this section!

Please call me if you have any questions.

Findings:

Book #1

1) Tab 2. Subtab for [redacted]. Behind two CoAs for [redacted]) there is a CoA for [redacted] (Metabolite). There is a separate subtab for the Metabolite records; should this page be removed from this section? SE 14-May-2015 moved to appropriate section.

2) Tab 2. Subtab for [redacted] Analytical Reference Standard log (part 2, page 5). Preparation of [redacted] required material to be weighed. There is no balance documented on the preparation record, and no record of a calibration being performed on the date of preparation (06Aug2014) in the balance log provided in section 3 for [redacted]. Please document the balance used when weighing standard. If a balance other than [redacted] was used, please include appropriate records in section 3. SE 14-May-2015 Balance information is not included on the Part 2 pages but on part 1. The part 1 pages are added to the databook to capture that information.

2) Tab 2. Subtab for [redacted] Analytical Reference Standard log (part 2, page 5[redacted] handwritten note indicates the standard is recertified past 31Oct2014 to 2016. However I cannot find a CoA that says this. Please include a copy of CoA recertification that extends expiry. SE 14-May-2015 New COA added to databook.

3) Tab 2. Subtab for [redacted] Analytical Reference Standard log. [redacted] has only month and day listed for expiration. Please update the expiration date entry with appropriate year. SE 14-May-2015 Corrected on original page and placed updated page in databook.

4) Tab 2. Subtab for [redacted] Metabolite [redacted]. Analytical Reference Standard Log. Corrections were made to Expiration date of [redacted] and [redacted] However it is not clear which date is the new expiration and which is the date the change was made. Please clarify this entry. SE 14-May-2015 No changes made-expiration date is the 7 sep 2014 and is legible.

5) Section 5, Temp Log Tab. There are no records in the Temp Log section. Please add appropriate temperature monitoring records. SE 14-May-2015 Added.

6) Section 7, Additional Study Info Tab. First page is titled Deviation between single injection >10% and lists several runs. Five of the runs have been crossed off by Sharpie. There is no additional explanation of this record. Please clarify this record. SE



[redacted]

14-May-2015- page removed. Only in place to capture what needed to be covered in the deviation.

7) Section 7, Additional Study Info Tab. Pipette Calibration pages. Please document what balance was used and provide appropriate pages in the balance log section of the binder. SE 14-May-2015 dibe

8) Section 7, Additional Study Info Tab. 2nd page of Pipette Calibration. A Pipette calibration for [redacted] (third calibration entry on this page) has two different date entries (18Dec2014 and 17Dec2014). Please review and clarify this record SE 14-May-2015 Corrected. [redacted]

9) Section 7, Additional Study Info Tab. Pipette calibration was performed on 10-3-13 for [redacted]. This states that it is prep for storage stability for [redacted] and [redacted]. There is no balance recorded. Please document what balance was used and provide appropriate pages in the balance log section of the binder. SE 14-May-2015 information added.

10) Section 7, Deviation Form, change #13 copy is filed in the middle of pipette calibration records. Please determine if this is misfiled and address as appropriate. SE 14-May-2015 Removed deviation- in the wrong place. Deviations are kept in the green folder.

11) Section 7 Pipette calibration record for Aug 11, 2014. Calibrations were performed 11 Aug 2014 for Rainin [redacted] and a Gilson pipette, but statistics were not calculated and recorded. Please update the record. SE 14-May-2015 done

12) Section 8 - Storage Stability – [redacted]. Sample Preparation sheet does not indicate what balance was used to prepare the SS sample and fortification. Please record the balance and provide appropriate pages in the balance log section of the binder. SE 14-May-2015 Information added to the page.

13) Page [redacted] Section 9, Tab: [redacted]. Sample [redacted] extraction started 23-Oct-2014, was refrigerated overnight. Additional steps 13-15 were done 24 Oct 2014. Spiking was performed and the samples were analyzed on 28-Oct-2014. How were extracts stored from 24-Oct-14 until 28-Oct-14? SE 14-May-2015 Information added.

14) Page [redacted] Section 9, Tab: [redacted] Calculation page printout cuts off final digits of sample IDs associated with [redacted] through [redacted]. Please clarify. SE 14-May-2015 information added.

Book #3

[redacted]. Laboratory Notes. Sample [redacted] was run with this assay. Please clarify why this spiking level (0.2ppm) was chosen. It is not discussed in the report. A note with this data set would be helpful. SE 14-May-2015 Not a GLP issue.

[redacted] Laboratory Notes. Entry for 19Dec14 indicates "spiked aliquot taken from sample 11 with metabolite creating sample [redacted]-1". It is not clear what sample 11 is. Please clarify. SE 14-May-2015 Corrected to Sample 1, - second "1" was a comma.

19) [redacted] Working Standard preparation sheet. Working standards [redacted] through [redacted] have an expiry of Dec-16-2014. These were used for the analysis of [redacted] Please raise a deviation and notify S.D. SE 14-May-2015 Will prepare deviation to cover issue.

17) [redacted] Calculation page. The 12th standard listed is called Standard [redacted]. This entry has chromatogram page referenced as [redacted], but this page is a Solvent Blank. This entry says its concentration is [redacted], however, that standard appears to be [redacted]. Please review this and other references and correct as appropriate. If there are changes to data as a result, please make necessary updates to the ASR. SE 14-May-2015 It appears that the sample was miss identified. Will confirm with analyst and make appropriate adjustments.

18) [redacted]. Instrument sample list report. A note written on this page indicates injection did not start because of a septum problem. Note says "Contact LRD for the change and agree". It is not clear if agreement was given. Please clarify. SE 14-May-2015 Should have been contacted rather than contact. LRD did agree.

19) [redacted] Table of Contents. Page numbers for Laboratory Notes and Calculation Page do not match those in the Table of Contents. Please make appropriate corrections. SE 14-May-2015- will have analyst reprint the table of contents with corrected page numbers.

20) [redacted] Working standards preparation sheet. The printed preparation date (13 Nov 2014) does not agree with the date the page is signed by the analyst (18 Nov 2014). Expiration is pre-printed as Nov 20, 2014. It isn't clear when the reagents were actually prepared and if expiry is appropriately assigned. SE 14-May-2015 it is correct.

Upon review of residue testing records for remaining trials (see table below), two of the three "lots" of working standards used were not signed on the stated date prepared. Please clarify these records. The date of preparation and expiration should not be pre-filled, but added in ink at the time of preparation by the analyst. If this record is to be included with later analyses, a true copy of the signed original should be made. SE 14-May-2015 I believe this is a recommendation rather than a requirement. Will review with analyst to determine how best to address in the future. Printed preparation dates are correct.

| Standards | Printed Prep Date | Printed Expiry | Analysis date Working Std Prep record dated & signed this day | Page Ref |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| [redacted] | Nov-5-14* not signed on this date | Nov-12-14 | Nov-6-14<br>Nov-6-14<br>Nov-10-14 | [redacted] |
| [redacted] | Nov-13-14* not signed on this date | Nov-20-14 | Nov-14-14<br>Nov-14-14<br>Nov-18-14 | |
| [redacted] | Dec-2-14 | Dec-16-14 | Dec-2-14<br>Dec-2-14<br>Dec-10-14<br>Dec-11-14<br>Dec-4-14<br>Dec-4-14<br>Dec-15-14<br>Dec-17-14*used expired | |

[redacted] Calculation page. The 7th through the 12th standards, their associated page reference ([redacted] and the assigned peak areas are not correct. For example, [redacted] data is from [redacted] and the value is 104 (not 863 as listed). Please review and correct as appropriate. If there are changes to data as a result of standard curve changes, please make necessary updates to the [redacted] May-2015 The standard ID was incorrect has been re-entered correctly.

Book 2(b)

[redacted] Table of contents. Entries for [redacted] through [redacted] are not correctly assigned. Please update as appropriate. SE 21-May-2015 Hand corrected

[redacted] Laboratory Notes. Please clarify when metabolite spike was added. SE 21-May-2015 Noted added

[redacted] Laboratory Notes. Please clarify when metabolite spike was added. SE 21-May-2015 Note added.

25) [redacted] Manual integration was performed for sample [redacted]-2. Unlike most instances of reintegration to remove an erroneously included neighboring peak, this reintegration adds in a peak and the resulting %Recovery passes. Please consider re-evaluating with respect to similarly shaped chromatogram of standard [redacted] Please update if appropriate. SE 21-May-2015 The use of manual integration did not impact whether the recovery did or did not pass. I believe this was a XXX call.

[redacted] Table of Contents. Sample IDs are incorrectly recorded. [redacted] should be [redacted] Please update as appropriate. SE 21-May-2015 Hand corrected.

[redacted] Table of Contents page from [redacted] This page appears to be a copy from another section, however both page numbers are present. Please clarify. Consider marking as True Copy. SE 21-May-2015 better copy prepared and included in the data file for clarity.

28) [redacted] A manual integration was performed for sample [redacted] 1. A peak are of 57 was replaced by a value of 79 after reintegration. There is no indication that this change was communicated to or approved by LRD. SE 21-May-2015 oversight by LRD

[redacted] Laboratory Notes. Please clarify when metabolite spike was added. SE 21-May-2015 Noted added

[redacted] Laboratory Notes. Please clarify when metabolite spike was added. SE 21-May-2015 Note added

Comments (No Responses Required): None

Thank you,

Lisa Latham, [redacted]

[redacted]